# EXHIBIT 1

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (the "**Agreement**") is made and entered into as of August 7, 2014, by and among: LEGALZOOM.COM, INC., a Delaware corporation ("**Parent**"); **LZ LOCAL, LLC**, an Illinois limited liability company and a wholly owned subsidiary of Parent, (the "**Merger Sub**"); AMICUS MEDIA LLC, an Illinois limited liability company (the "**Company**"); RICHARD KOMAIKO, as the Unitholder Representative (the "**Unitholder Representative**"); RICHARD KOMAIKO, BEBEI QUE and BRYAN HARRIS, each in their individual capacity (collectively, the "**Key Employees**"). Certain capitalized terms used in this Agreement are defined in Exhibit A.

### RECITALS

**A.**    Parent, Merger Sub and the Company intend to effect a merger (the "**Merger**") of Merger Sub with and into the Company in accordance with this Agreement and the Illinois Limited Liability Company Act (the "**ILLCA**"). Upon the consummation of the Merger, Merger Sub will cease to exist and the Company will become a wholly-owned Subsidiary of Parent.

**B.**    Immediately following the execution and delivery of this Agreement, the board of managers of the Company and all holders of Units will execute and deliver a written consent approving this Agreement and the Merger (collectively, the "**Written Consent**").

**C.**    Concurrently with the execution of this Agreement, and as a condition and inducement to the willingness of Parent to enter into this Agreement, each Key Employee is (i) executing and delivering an offer letter to the Surviving Company; and (ii) executing and delivering a Non-Competition and Non-Solicitation Agreement (the "**Non-Compete Agreement**") in favor of the Company and Parent.

### AGREEMENT

The parties to this Agreement, intending to be legally bound, agree as follows:

**SECTION 1.    DESCRIPTION OF TRANSACTION**

**1.1    Merger of Merger Sub into the Company.**    Upon the terms and subject to the conditions set forth in this Agreement and in accordance with the ILLCA, at the Effective Time, Merger Sub shall be merged with and into the Company, the separate existence of Merger Sub shall cease and the Company will continue as the surviving company in the Merger (the "**Surviving Company**"). The Merger shall have the effects set forth in this Agreement and in the applicable provisions of the ILLCA.

**1.2    Treatment of Unitholders.**    At the Effective Time, by virtue of the Merger and without any further action on the part of Parent, Merger Sub or the Company or any member of the Company, subject to Section 1.6, each Unit issued and outstanding immediately prior to the Effective Time shall be converted into the right to receive from Parent (a) an amount in cash equal to the Per Unit Closing Amount plus (b) the cash payments, if any, which may be payable with respect to such Unit pursuant to Sections 1.5(a) and 1.5(b), but subject to Parent's rights under Section 6. The amount of cash that each Unitholder is entitled to receive for Units held by such Unitholder shall be rounded to the nearest cent (with $0.005 being rounded upward) in each case that a cash payment is to be made to such Unitholder.

**1.3    Closing; Effective Time.**

(a)    The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Cooley LLP in Santa Monica, California immediately following the execution of this Agreement or at such other time or place as Parent and the Company may mutually agree. The date on which the Closing actually takes place is referred to in this Agreement as the "**Closing Date**."

(b)    On the Closing Date, Parent shall file properly executed articles of merger conforming to the requirements of the ILLCA (the "**Articles of Merger**") with the Secretary of State of the State of Illinois. The Merger shall become effective at the time the Articles of Merger are filed with the Secretary of State of the State of Illinois (the time at which the Merger becomes effective being referred to in this Agreement as the "**Effective Time**").

(c)    At the Effective Time: (a) the Articles of Organization of Merger Sub immediately prior to the Effective Time shall be the Articles of Organization of the Surviving Company, until amended as provided in the ILLCA; (b) the operating agreement of Merger Sub immediately prior to the Effective Time shall be the operating agreement of the Surviving Company; and (c) the sole member of the Surviving Company shall be Parent.

(d)    The officers of Merger Sub immediately prior to the Effective Time, who are Richard Komaiko as Chief Executive Officer, Beibei Qui as Chief Marketing Officer, Fred Krupica as Chief Financial Officer and Chas Rampenthal as Secretary, shall be the officers of the Surviving Company until their successors have been duly elected and have qualified or until their death, resignation or their removal in accordance with the operating agreement of the Surviving Company and the ILLCA.

1.4    **Closing Payments.**

(a)    Promptly following the delivery by a Unitholder to Parent of a duly completed and executed letter of transmittal, in the form attached hereto as <u>Exhibit B</u> (the "**Letter of Transmittal**"), together with all documents contemplated thereby, and, in any event, within five business days thereafter, Parent shall pay, or cause to be paid, to such Unitholder the portion of the Upfront Consideration payable to such Unitholder in accordance with Section 1.2, as reflected on the Allocation Certificate.

(b)    Promptly following the Effective Time and, in any event, within five business days thereafter, Parent shall pay, or cause to be paid (by check or wire transfer), the Unpaid Transaction Expenses to the third parties to whom such amounts are owed, in each case in the amounts, and in accordance with the instructions, set forth on the Allocation Certificate.

1.5    **Post-Closing Payments**.

(a)    <u>Reserve Payment</u>.

(i)    Subject to the terms of Section 1.5(a)(ii), promptly following July 1, 2018 (the "**Reserve Payment Date**") and in any event within 10 days thereafter, Parent shall pay, or cause to be paid, to each Unitholder an amount in cash equal to such Unitholder's Pro Rata Percentage of the Reserve Payment as set forth on the Allocation Certificate, subject to the withholding obligations set forth in Section 1.6; *provided*, *however*, that the Reserve Payment Date shall mean July 1, 2017 in the event that either John Suh or Edward Hartman is no longer an officer of any Parent Entity on July 1, 2017; *provided*, *further*, that if the LZL business is discontinued entirely, the Reserve Payment Date shall be the date on which the LZL business is discontinued.

(ii)      If, prior to the Reserve Payment Date, the employment of one Specified Employee is terminated with the Surviving Company (or another Parent Entity) by such Specified Employee without Good Reason or by Parent (or an Affiliate) for Cause, then the amount payable to the Unitholders pursuant to Section 1.5(a)(i) shall be 50% of the Reserve Payment.  If, prior to the Reserve Payment Date, the employment of both Specified Employees is terminated with the Surviving Company (or another Parent Entity) by such Specified Employees without Good Reason or by Parent (or an Affiliate) for Cause, then the Unitholders shall no longer be entitled to any portion of the Reserve Payment and Parent will be under no further obligation to pay any portion of the Reserve Payment to any Unitholders (for the avoidance of doubt, the foregoing shall apply if the employment of one Specified Employee is terminated without Good Reason and another Specified Employee is terminated by Parent (or an Affiliate) for Cause).

(b)      <u>Earnout Payments</u>.

(i)      *Definitions*. For purposes of this Section 1.5(b), the following terms shall have the following meanings:

(A)      "**Adjusted EBITDA**" shall mean, for any applicable period, earnings before interest, taxes, depreciation and amortization with respect to Lead Generation Offers, practice management services, and other products or services mutually agreed between Parent and the general manager of Company, offered by the LegalZoom Local division ("**LZL**") to United States based customers via the LZL website for such period, determined in accordance with Schedule 1.5(b) hereto less all capital expenditures of LZL.

(B)      "**Adjustment Amount**" shall mean (1) the sum of the First Half Year 1 Adjusted EBITDA plus the Second Half Year 1 Adjusted EBITDA less (2) the Year 1 Adjusted EBITDA.  If the Adjustment Amount is a negative number, it shall be deemed to be zero ($0).

(C)      "**Earnout Amounts**" shall mean the Year 1 Adjusted EBITDA, the Year 2 Adjusted EBITDA and the Year 3 Adjusted EBITDA, collectively.

(D)      "**Earnout Period**" shall mean the period commencing on July 1, 2014 and ending on June 30, 2017.

(E)      "**First Half Year 1**" shall mean the period starting on July 1, 2014 and ending on December 31, 2014.

(F)      "**First Half Year 1 ADJUSTED EBITDA**" shall mean an amount equal to the lesser of (1) the EBITDA applicable to First Half Year 1 and (2) $4,000,000.

(G)      "**Second Half Year 1**" shall mean the period starting on January 1, 2015 and ending on June 30, 2015.

(H)      "**Second Half Year 1 ADJUSTED EBITDA**" shall mean an amount equal to the lesser of (1) the Adjusted EBITDA applicable to Second Half Year 1 and (2) $4,000,000 minus positive Adjusted EBIDTA applicable to First Half Year 1.

3.

**(I)**    "**Year 1 ADJUSTED EBITDA**" shall mean an amount equal to the lesser of (1) the Adjusted EBITDA applicable to Year 1 and (2) $4,000,000.

**(J)**    "**Year 1**" shall mean the period starting on July 1, 2014 and ending on June 30, 2015.

**(K)**    "**Year 2**" shall mean the period starting on July 1, 2015 and ending on June 30, 2016.

**(L)**    "**Year 2 ADJUSTED EBITDA**" shall mean the amount of Adjusted EBITDA in Year 2, not to exceed $4,000,000, less the Adjustment Amount; *provided*, that if the bankruptcy revenue in Year 2 less the associated search engine marketing and customer care costs for Year 2 is less than $500,000, no bankruptcy revenue for Year 2 shall be included as earnings.

**(M)**    "**Year 3**" shall mean the period starting on July 1, 2016 and ending on June 30, 2017.

**(N)**    "**Year 3 ADJUSTED EBITDA**" shall mean the amount of Adjusted EBITDA in Year 3, not to exceed the lesser of $6,000,000 and an amount sufficient to reach the maximum payment set forth in Section 1.5(b)(v) below; *provided*, that if the bankruptcy revenue in Year 3 less the associated search engine marketing and customer care costs for Year 3 is less than $500,000, no bankruptcy revenue for Year 3 shall be included as earnings.

**(ii)**    *Determination of Earnout Amounts*.

**(A)**    **Earnout Consideration Statement**.  Not later than 90 calendar days following the last day of each of First Half Year 1, Second Half Year 1, Year 2 and Year 3, Parent shall prepare and deliver to the Unitholder Representative a statement (each, an "**Earnout Consideration Statement**") setting forth Parent's calculation of the First Half Year 1 Adjusted EBIDTA, Second Half Year 1 Adjusted EBIDTA, Year 2 Adjusted EBITDA or Year 3 Adjusted EBITDA, as applicable, which Earnout Consideration Statement shall include reasonable detail of the components of the First Half Year 1 Adjusted EBIDTA, Second Half Year 1 Adjusted EBIDTA, Year 2 Adjusted EBITDA or Year 3 Adjusted EBITDA, as applicable, and appropriate reasonable supporting documentation for each such component.  During the 30 calendar day period following receipt by the Unitholder Representative of an Earnout Consideration Statement, Parent shall provide reasonable access during normal business hours to and otherwise make available to the Unitholder Representative the relevant accounting records, work papers, schedules and calculations that were used in or otherwise applicable to a determination of the First Half Year 1 Adjusted EBIDTA, Second Half Year 1 Adjusted EBIDTA, Year 2 Adjusted EBITDA or Year 3 Adjusted EBITDA, as applicable, any of Parent's independent auditor's work papers related to the calculation of such amounts (subject to execution of standard release and/or other agreements required by Parent's independent auditors), and any other documents that may be reasonably requested by the Unitholder Representative to confirm the calculation of the First Half Year 1 Adjusted EBIDTA, Second Half Year 1 Adjusted EBIDTA, Year 2 Adjusted EBITDA or Year 3 Adjusted EBITDA, as applicable.

**(B)**    **Earnout Consideration Notice of Disagreement**.  The Earnout Consideration Statement shall become final and binding upon Parent, the Earn-Out Participants and the Unitholder Representative on the earlier of (1) the Unitholder Representative's written acceptance thereof and (2) the 30th day following delivery thereof, unless the Unitholder Representative delivers written notice of its disagreement with the Earnout Consideration Statement (an "**Earnout Consideration Notice of Disagreement**") to Parent prior to such date.  Each Earnout Consideration Notice of Disagreement

shall specify all items with which the Unitholder Representative disagrees in sufficient detail for Parent to understand the nature of the disagreement. Except as set forth in an Earnout Consideration Notice of Disagreement, the Unitholder Representative shall be deemed to have agreed with all other items and amounts contained in the Earnout Consideration Statement. If the Unitholder Representative does not deliver an Earnout Consideration Notice of Disagreement within such 30 day period, then the Earnout Consideration Statement shall be deemed to be finally determined as set forth in Parent's calculation thereof, subject to adjustment as set forth in Section 1.5(b)(iv)  If an Earnout Consideration Notice of Disagreement is delivered to Parent in a timely manner, then the Earnout Consideration Statement (as revised in accordance with this Section 1.5(b)) shall become final and binding (subject to adjustment as set forth in Section 1.4(b)(iv)] upon Parent, the Earn-Out Participants and the Unitholder Representative on the earlier of (x) the date the Unitholder Representative and Parent resolve in writing any differences they have with respect to the matters specified in the Earnout Consideration Notice of Disagreement or (y) the date any disputed matters are finally resolved in writing by the Independent Auditors. During the 30 calendar day period following the delivery of an Earnout Consideration Notice of Disagreement, the Unitholder Representative and Parent shall seek in good faith to resolve any differences that they may have with respect to the matters specified in the Earnout Consideration Notice of Disagreement.

           **(C)**   **Independent Auditors**. If Parent and the Unitholder Representative are not able to resolve their differences during such 30 calendar day period following delivery of an Earnout Consideration Notice of Disagreement, then at the end of such period, the Unitholder Representative shall submit to the Independent Auditors for determination any and all matters that remain in dispute solely with respect to the calculation of the Year 1 Adjusted EBITDA, Year 2 Adjusted EBITDA or Year 3 Adjusted EBITDA, as applicable, which matters shall be described in a written brief delivered to the Independent Auditors. Parent and the Unitholder Representative shall cooperate in good faith to agree upon the specific disagreements to be submitted to the Independent Auditors, the method for submitting such disagreements, applicable guidelines to govern communications with the Independent Auditors and other procedural rules with respect to the arbitration. Parent and the Unitholder Representative shall make readily available to the Independent Auditors all relevant accounting books and records and any accounting work papers (subject to execution of standard release and/or other agreements required by Parent's independent auditors) relating to the Earnout Consideration Statement or the Earnout Consideration Notice of Disagreement, and all other items reasonably requested by the Independent Auditors. In resolving the differences with respect to matters specified in the Earnout Consideration Notice of Disagreement, the Independent Auditors shall (1) consider only those items or amounts disputed by the Unitholder Representative in the Earnout Consideration Notice of Disagreement which remain in dispute; (2) shall not assign a value to any item or amount in dispute greater than the greatest value for such item or amount or less than the smallest value for such item or amount, in each case assigned by the Unitholder Representative, on the one hand, or Parent, on the other hand; (3) shall act as an expert and not as an arbitrator. The Independent Auditors shall deliver to the Unitholder Representative and Parent as promptly as practicable (but in any event within 30 days of the retention) a report setting forth its determination. Such report shall, upon delivery to the Unitholder Representative and Parent and absent manifest error, be final, binding and conclusive upon the Unitholder Representative, the Earn-Out Participants and Parent with respect to the disputes resolved. The costs, fees and other expenses of the Independent Auditors in connection with the dispute resolution process set forth in this Section 1.5(b) shall be borne by Parent, on the one hand, and the Earn-Out Participants, on the other hand, based on the percentage which the portion of the disputed amount not awarded to each party bears to the amount actually disputed by such party, with the amount to be paid by the Earn-Out Participants to be deducted from the applicable Earnout Amount payable to the Earn-Out Participants. All other fees and expenses incurred in connection with the dispute resolution process set forth in Section

1.5(b), including fees and expenses of attorneys and accountants, shall be borne and paid by the party incurring such expenses.

    **(iii)**  *Payment of Earnout Amounts*. Subject to Section 1.6, (A)(1) with respect to First Half Year 1, no later than 10 days following the date on which the Earnout Consideration Statement for First Half Year 1 becomes final and binding, Parent shall pay to each Earn-Out Participant an amount in cash equal to such Earn Out Participant's Earn-Out Percentage of the First Half Year 1 Adjusted EBITDA and (2) with respect to Second Half Year 1, no later than 10 days following the date on which the Earnout Consideration Statement for Second Half Year 1 becomes final and binding, Parent shall pay to each Earn-Out Participant an amount in cash equal to such Earn-Out Participant's Earn-Out Percentage of the Second Half Year 1 Adjusted EBITDA; (B) with respect to Year 2, no later than 10 days following the date on which the Earnout Consideration Statement for Year 2 becomes final and binding, Parent shall pay to each Earn-Out Participant an amount in cash equal to such Earn-Out Participant's Earn-Out Percentage of the Year 2 Adjusted EBITDA; and (C) with respect to Year 3, no later than 10 days following the date on which the Earnout Consideration statement for Year 3 becomes final and binding, Parent shall pay to each Earn-Out Participant an amount in cash equal to 80% of such Earn-Out Participant's Earn-Out Percentage of the Year 3 Adjusted EBITDA. The amount that is equal to 20% of the Year 3 EBITDA is the "**Earnout Holdback Amount**." Any payments made pursuant to this Section 1.5(b)(iii) shall be net of any amounts subject to any setoff rights expressly contemplated by this Agreement. For the avoidance of doubt, if Adjusted EBITDA for any applicable period is less than zero ($0), no amount shall be paid.

    **(iv)**  *Adjustments*.

    (A)  **Year 1**. Following the completion of the audit of Parent's 2015 financial statements, if the Year 1 Adjusted EBITDA as calculated based on the information set forth in the 2014 and 2015 audited financial statements (1) is greater than the Year 1 Adjusted EBITDA paid pursuant to Section 1.5(b)(iii)(A), Parent shall, subject to the provisions of Section 1.5(b)(v), pay to each Earn-Out Participant an amount in cash equal to such Earn-Out Participant's Earn-Out Percentage of such excess amount (*provided, that*, the aggregate of such excess payment when combined with the amounts paid pursuant to Section 1.5(b)(iii)(A) shall not exceed $4,000,000) and (2) is less than the Year 1 Adjusted EBITDA paid pursuant to Section 1.5(b)(iii)(A), Parent shall be entitled to deduct such deficiency from the Year 2 Adjusted EBITDA and/or Year 3 Adjusted EBITDA payable to the Earn-Out Participants pursuant to Section 1.5(b)(iii)(B).

    (B)  **Year 2**. Following the completion of the audit of Parent's 2016 financial statements, if the Year 2 Adjusted EBITDA as calculated based on the information set forth in the 2015 and 2016 audited financial statements (1) is greater than the Year 2 Adjusted EBITDA paid pursuant to Section 1.5(b)(iii)(B), Parent shall, subject to the provisions of Section 1.5(b)(v), pay to each Earn-Out Participant an amount in cash equal to such Earn-Out Participant's Earn-Out Percentage of such excess amount (*provided, that*, the aggregate of such excess payment when combined with the amounts paid pursuant to Section 1.5(b)(iii)(B) shall not exceed $4,000,000) and (2) is less than the Year 2 Adjusted EBITDA paid pursuant to Section 1.5(b)(iii)(B), Parent shall be entitled to deduct such deficiency from the Year 3 Adjusted EBITDA payable to the Earn-Out Participants pursuant to Section 1.5(b)(iii)(C).

    (C)  **Year 3**. Following the completion of the audit of Parent's 2017 financial statements, if the Year 3 Adjusted EBITDA as calculated based on the information set forth in the 2016 and 2017 audited financial statements (1) is greater than the Year 3 Adjusted EBITDA

calculated pursuant to Section 1.5(b)(ii), Parent shall, subject to the provisions of Section 1.5(b)(v), pay to each Earn-Out Participant an amount in cash equal to such Earn-Out Participant's Earn-Out Percentage of such excess amount and of the Earnout Holdback Amount (*provided, that*, the aggregate of such excess payment when combined with the amounts paid pursuant to Section 1.5(b)(iii)(C) shall not exceed the lesser of $6,000,000 and an amount sufficient to reach the maximum payment set forth in Section 1.5(b)(v) below) and (2) is less than the Year 3 Adjusted EBITDA calculated pursuant to Section 1.4(b)(ii), Parent shall be entitled to deduct such deficiency from the Earnout Holdback Amount and, after reflecting such deduction, Parent shall pay to each Earn-Out Participant an amount in cash equal to such Earn-Out Participant's Earn-Out Percentage of the remaining balance of the Earnout Holdback Amount.

(v)    *Maximum Payment*.  Notwithstanding anything to the contrary contained herein the maximum amount payable to the Earn-Out Participants pursuant to this Section 1.5(b) shall be $10,000,000.

(vi)    *Assignability*.  No rights or interest of any Earn-Out Participant under this Section 1.5(b) may be assigned, transferred or otherwise disposed of, in whole or in part, other than pursuant to the laws of descent and distribution or by will.

(vii)    *Parent Actions*.  During the Earnout Period, Parent shall not take any action in bad faith whose primary purpose is to minimize or interfere with the maximization of the Year 1 Adjusted EBITDA, Year 2 Adjusted EBITDA or Year 3 Adjusted EBITDA.  Notwithstanding the foregoing, for the avoidance of doubt, except as set forth in the following sentence, Parent shall have sole discretion over all matters relating to the business of the Surviving Company and LZL, including the termination of any Key Employee, and shall be under no obligation to operate (or cause to be operated) Parent, the Surviving Company or LZL to achieve any specific level of Year 1 Adjusted EBITDA (including First Half Year 1 Adjusted EBIDTA or Second Half Year 1 Adjusted EBITDA), Year 2 Adjusted EBITDA or Year 3 Adjusted EBITDA. During the Earnout Period, except with the prior written consent of the Unitholder Representative, Parent agrees that it will not, and it will cause each of its Subsidiaries (including the Acquired Companies) not to, enter into or maintain after December 31, 2014 any exclusive Lead Generation offers.  "Lead Generation Offer" means any arrangement, written or oral, whereby Parent or any of its Subsidiaries (including the Acquired Companies) sells, conveys or offers a customer's data, a customer data list or a live transfer or scheduled appointment to an attorney, law firm or aggregator of attorneys or firms for an agreed price or price set by a system, such as an electronic bidding system .

1.6    **Withholding Taxes**.  Parent shall be entitled to deduct and withhold from any consideration payable or otherwise deliverable to any Unitholder and any other Earn-Out Participant pursuant to this Agreement such amounts as Parent is required to deduct or withhold therefrom under the Code or under any provision of state, local or foreign Tax law.  To the extent such amounts are so deducted or withheld and promptly remitted to the applicable Tax authorities, in accordance with applicable Legal Requirements, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid.

1.7    **Transfer Books; No Further Ownership Rights in Units; No Liability**.  At the Effective Time: (a) all Units outstanding immediately prior to the Effective Time shall automatically be canceled and retired and shall cease to exist, and all Unitholders shall cease to have any rights as equityholders of the Company, except the right to receive the applicable consideration with respect to

each Unit; and (b) the transfer books of the Company shall be closed and there shall be no further registration of transfers on the stock transfer books of the Surviving Company of the Units that were outstanding immediately prior to the Effective Time.  None of Parent, the Company or the Merger Sub shall be liable to any holder of a Unit for any cash delivered to a public official pursuant to any abandoned property, escheat or similar Legal Requirements.

      **1.8**   **Further Action.**  If, at any time after the Closing, any further action is determined by Parent to be reasonably necessary or desirable to carry out the purposes of this Agreement or to vest Parent and the Company with full right, title and possession of and to all rights and property of the Company, the officers and directors of Parent and the Company shall be fully authorized to take such action.

**SECTION 2.**   **REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE KEY EMPLOYEES**

      The Company and the Key Employees represent and warrant to and for the benefit of the Indemnitees, as of the date of this Agreement and as of the Closing Date, subject to such exceptions as are specifically disclosed in the disclosure schedule (referencing the appropriate section and subsection numbers) supplied by the Company to Parent (the "**Disclosure Schedule**") (it being understood that the disclosure set forth in each section and subsection of the Disclosure Schedule shall qualify (a) the representations and warranties set forth in the corresponding section or subsection of this Section 2, (b) any exception or disclosure explicitly cross-referenced to such part or subpart of the Disclosure Schedule by reference from another part or subpart of the Disclosure Schedule and (c) any other representations and warranties set forth in this Section 2 if it is readily apparent based on the face of such disclosure that the disclosure applies to such other representations and warranties), as follows:

      **2.1**   **Subsidiaries; Due Organization.**

      **(a)**   The Company has no, and has never had any, Subsidiaries and the Company does not own any capital stock of, or any equity interest of any nature in, any other Entity.  None of the Acquired Companies has agreed or is obligated to make, nor is bound by any Contract under which it may become obligated to make, any future investment in or capital contribution to any other Entity.  None of the Acquired Companies has, at any time, been a general partner of, nor has it otherwise been liable for any of the debts or other obligations of, any general partnership, limited partnership or other Entity.

      **(b)**   The Company is a limited liability company duly organized, validly existing and in good standing under the laws of Illinois and has all necessary limited liability company power and authority:  (i) to conduct the Business; (ii) to own and use its assets in the manner in which its assets are currently owned and used; and (iii) to perform its obligations under all Contracts by which it is bound.

      **(c)**   The Company is qualified to do business as a foreign company and is in good standing in each jurisdiction where the nature of its Business requires such qualification, except for the failure to be so qualified would not have a Material Adverse Effect.

      **(d)**   The Company has not conducted any business under or otherwise used, for any purpose or in any jurisdiction, any fictitious name, assumed name, trade name or other name, other than the name "Amicus Media LLC".

(e)    Part 2.1(e) of the Disclosure Schedule accurately sets forth the names and titles, as applicable, of each member of the board of advisors, director, officer and manager of each Acquired Company.

**2.2    Articles of Organization and Operating Agreement; Records.**  The Company has delivered to Parent accurate and complete copies of: (a) the articles of organization, operating agreement, bylaws and other charter and organizational documents of each of the Acquired Companies, including all amendments thereto; (b) the equity records of each of the Acquired Companies; and (c) the minutes and other records of the meetings of, if applicable, the board of directors and the board of advisors of each of the Acquired Companies.  The books of account, equity records, minute books and other proceedings (including any actions taken by written consent or otherwise without a meeting) of the members of the Company, the board of advisors of the Company and all committees of the records of the Company are accurate, up-to-date and complete in all material respects and have been maintained in accordance with prudent business practices.

**2.3    Capitalization**

(a)    The authorized equity of the Company consists of (a) 110,000 Units, of which 77,505 Units are issued and outstanding.  The Company does not hold any Units in its treasury.  All of the outstanding Units have been duly authorized and validly issued and are fully paid and nonassessable.  The Units are held by the Persons in the amounts set forth in Part 2.3(a) of the Disclosure Schedule, which further sets forth for each such Unitholder the number of Units held.  The Unitholders are the owners of record of all the Units.  None of the outstanding Units are entitled or subject to any preemptive right, right of participation or any similar right or subject to any right of first refusal or similar right in favor of the Company or any other Person.  There is no Company Contract relating to the voting or registration of, or restricting any Person from purchasing, selling, pledging or otherwise disposing of (or granting any option or similar right with respect to), any Units.  The Company is not under any obligation, or is bound by any Contract pursuant to which it may become obligated, to repurchase, redeem or otherwise acquire any outstanding Units or any other securities.  None of the Units are subject to a repurchase option in favor of the Company or any other Person.

(b)    The Company has never adopted, sponsored or maintained any equity plan or any other plan or agreement providing for equity compensation to any person.

(c)    There are no: (i) outstanding subscription, option, call, warrant or right (whether or not currently exercisable) to acquire any Units or other securities of the Company; (ii) outstanding security, instrument or obligation that is or may become convertible into or exchangeable for any Units or other securities of any of the Company; (iii) Contract under which any of the Company is or may become obligated to sell or otherwise issue any shares of its Units or any other securities; or (iv) condition or circumstance that could reasonably be expected to give rise to or provide a reasonable basis for the assertion of a claim by any Person to the effect that such Person is entitled to acquire or receive (A) any Units or other securities of the Company or (B) any portion of the consideration payable in connection with the Transactions.

(d)    All Units have been issued and granted in compliance with all applicable securities laws and other applicable Legal Requirements and all requirements set forth in applicable Contracts.

(e)    The Company has not repurchased, redeemed or otherwise reacquired any Units, other than in connection with the termination of a Company Employee's employment.  All securities so

9.

reacquired by the Company were reacquired in compliance with (i) all applicable Legal Requirements and (ii) all applicable Contracts.

        **(f)**    The Allocation Certificate is accurate in all respects.  The allocation of the consideration set forth in Section 1.2 hereof and on the Allocation Certificate is consistent with the operating agreement of the Company and any other applicable Company Contracts.

    **2.4**    **Financial Statements; Financial Controls; Liabilities**.

        **(a)**    The Company has delivered to Parent the following financial statements (collectively, the "**Company Financial Statements**"): (a) an unaudited balance sheet of the Company as of December 31, 2012 and the related statements of income and cash flows for the fiscal year then ended; (b) an [un]audited balance sheet of the Company as of December 31, 2013 and the related statements of income and cash flows for the fiscal year then ended; and (c) the unaudited balance sheet of the Company as of June 30, 2014 (the "**Interim Balance Sheet**") and the related statements of income and cash flows for the for the six  months then ended.

        **(b)**    The Company Financial Statements are accurate and complete in all material respects and fairly present the financial position of the Company as of the respective dates thereof and the results of operations and cash flows of the Company for the periods covered thereby.  The Company Financial Statements have been prepared in accordance with the books and records of the companies.

        **(c)**    The Company maintains accurate books and records reflecting its assets and liabilities.

        **(d)**    The Company has no obligations or liabilities of any nature (matured or unmatured, fixed or contingent) of the type required to be reflected in the liabilities column of a balance sheet prepared in accordance with GAAP other than (a) those set forth or adequately provided for on the Interim Company Balance Sheet or (b) the Outstanding Payables.

    **2.5**    **Absence of Changes.**  Since the Interim Balance Sheet Date:  (a) there has not been any adverse change in, and no event has occurred that could reasonably be expected to have, an adverse effect on, the Business, condition, assets, liabilities, operations, prospects, net income or financial performance of the Acquired Companies; (b) there has not been any loss, damage or destruction to, or any interruption in the use of, any of the assets of the Acquired Companies; (c) no Acquired Company has declared, accrued, set aside or paid any dividend or made any other distribution in respect of any shares of capital stock, membership interests or other securities or repurchased, redeemed or otherwise reacquired any shares of capital stock, membership interests or other securities; (d) no Acquired Company has made any capital expenditure in excess of $2,500 individually or $5,000 in the aggregate;  (e) no Acquired Company has leased or licensed any asset to or from any other Person; (f) no Acquired Company has made any loan or advance to any other Person (other than travel advances made to employees in the ordinary course of business); (g) no Company Contract has been amended or terminated; (h) no Acquired Company has forgiven any debt or otherwise released or waived any material right or claim; (i) no Acquired Company has entered into any transaction outside the ordinary course of business or taken any other action outside the ordinary course of business; and (j) no Acquired Company has agreed, committed or offered (in writing or otherwise) to take any of the actions referred to in clauses "(a)" through "(j)" above.

    **2.6**    **Title to Assets.**  Each of the Acquired Companies owns, and has good and valid title to, all of the tangible assets purported to be owned by it, including (a) all assets reflected on the Interim

Balance Sheet; (b) all assets acquired by the Acquired Companies since such date; (c) all rights of the Acquired Companies under the Company Contracts; and (d) all other assets reflected in the books and records of the Acquired Companies as being owned by the Acquired Companies.  All of the foregoing assets listed in subsections (a) through (d) are owned by the Acquired Companies free and clear of any Encumbrances, except for Permitted Encumbrances.

       **2.7**    **Bank Accounts; Loans**.

        **(a)**    Part 2.7(a) of the Disclosure Schedule provides accurate information with respect to each account maintained by or for the benefit of any of the Acquired Companies at any bank or other financial institution.

        **(b)**    No Acquired Company has made any loans or advances to any employee, advisor, consultant or independent contractor, other than routine travel advances made to employees in the ordinary course of business.

       **2.8**    **Equipment; Leasehold.**  All material items of equipment and other tangible assets owned by or leased to any of the Acquired Companies are adequate for the uses to which they are being put, are in good condition and repair (ordinary wear and tear excepted) and are adequate for the conduct of the Business.  No Acquired Company owns any real property or any interest in real property, except for the leaseholds created under the real property leases identified in Part 2.8 of the Disclosure Schedule.

       **2.9**    **Intellectual Property**.

        **(a)**    Part 2.9(a) of the Disclosure Schedule accurately identifies and describes each service and product that is currently being, or has at any time been, marketed, distributed, provided, licensed, offered online or sold by the Acquired Companies in the operation of the Business, or that is currently being designed or developed to be marketed, distributed, provided, licensed, offered online or sold by the Acquired Companies in the operation of the Business, in each case, including in beta form (each, a "**Company Product or Service**").

        **(b)**    Part 2.9(b) of the Disclosure Schedule accurately identifies: (i) each item of Registered IP in which any Acquired Company has or purports to have an ownership interest of any nature (whether exclusively, jointly with another Person, or otherwise); (ii) the jurisdiction in which such item of Registered IP has been registered or filed and the applicable registration or serial number; (iii) any other Person that has an ownership interest in such item of Registered IP and the nature of such ownership interest; and (iv) each Company Product or Service that embodies, utilizes or is based upon or derived from (or, with respect to Company Product or Services currently under development, that is expected to embody, utilize or be based upon or derived from) any patent issued to, or patent application applied for by, any Acquired Company.  The Company has provided to Parent complete and accurate copies of all applications, material non-privileged correspondence and other material, non-privileged documents related to each such item of Registered IP.

        **(c)**    Part 2.9(c) of the Disclosure Schedule accurately identifies: (i) all Company IP that is or has been licensed to any Acquired Company by a third party for use in the Business (collectively, "**Licenses-In**") (other than non-customized third-party software licensed on a non-exclusive basis in binary code form that (1) is not incorporated into, or used in the development, manufacturing, testing, distribution, maintenance or support of, any Company Product or Service and is not otherwise material to the Business; and (2) is generally available to the public on standard terms and imposes no future monetary obligation on any Acquired Company), and any Company IP that has been sold, assigned

or otherwise conveyed or provided to any Acquired Company by a third party for use in the Business; (ii) the corresponding Contract or Contracts pursuant to which such Company IP has been licensed, sold, assigned, or otherwise conveyed or provided to any Acquired Company (other than Contracts between an Acquired Company, on the one hand, and its employees, independent contractors or consultants on the other hand, in one of the Company's standard forms thereof); and (iii) whether the licenses or rights granted to the Acquired Companies in each such Contract are exclusive or non-exclusive. The Company has delivered to Parent complete and accurate copies of each Contract identified or required to be identified in Part 2.9(c) of the Disclosure Schedule.

      **(d)**      Part 2.9(d) of the Disclosure Schedule accurately identifies each Contract pursuant to which any Person has been granted any license under, or otherwise has received or acquired any right (whether or not currently exercisable) or interest in, any Company Product or Service or Company IP (collectively, "**Licenses-Out**") (other than non-exclusive, internal use, object code software licenses (or software as a service subscriptions) granted to end user customers in the ordinary course of Business pursuant to the Company's standard form of end user license or subscription agreement). No Acquired Company is bound by, and no Company IP is subject to, any Contract containing any covenant or other provision that in any way limits or restricts the ability of any Acquired Company to use, exploit, assert, or enforce any Company IP anywhere in the world.

      **(e)**      Part 2.9(e) of the Disclosure Schedule contains a complete and accurate list and summary of all royalties, fees, commissions, and other amounts payable by any Acquired Company to any other Person under any Contract (other than sales commissions paid to employees according to the Company's standard commissions plan) upon or for the use, sale or distribution of any Company Product or Service or the use of any Company IP.

      **(f)**      The Company has provided to Parent a complete and accurate copy of each of the following standard forms of Contract used by any Acquired Company at any time in connection with the Business: (i) employee agreement containing any assignment or license of Intellectual Property or Intellectual Property Rights or any confidentiality provision; (ii) consulting or independent contractor agreement containing any assignment or license of Intellectual Property or Intellectual Property Rights or any confidentiality provision; (iii) confidentiality or nondisclosure agreement; (iv) end user license or subscription agreement, consulting services, or other customer-facing agreement; (v) development agreement; (vi) distributor or other Company Contract related to the distribution or resale of any Company Product or Service; (vii) Terms of Service or similar agreements with any user of any Company Product or Service; and (viii) affiliate, referral, or website traffic arrangement agreements. The Company has also delivered to Parent complete and accurate copies of each Company Contract that deviates in any material respect from the corresponding standard form agreement described herein and provided to Parent, including any agreement with an employee, consultant, independent contractor, or Company Customer in which the employee, consultant, independent contractor or Company Customer expressly reserved or retained rights in any Intellectual Property or Intellectual Property Rights incorporated into or used in connection with any Company Product or Service or otherwise related to the Business.

      **(g)**      The Company exclusively owns all right, title, and interest to and in the Company IP (other than Intellectual Property Rights licensed to the Company under the Licenses-In, as identified in Part 2.9(c) of the Disclosure Schedule) free and clear of any Encumbrances (other than for Permitted Encumbrances or licenses and rights granted pursuant to the Licenses-Out identified in Part 2.9(d) of the Disclosure Schedule). Each Acquired Company has a valid right to use and otherwise exploit, and to license others to use and otherwise exploit, all Company IP identified or required to be identified in Part 2.9(c) of the Disclosure Schedule in the operation of the Business and in the operation of the business as presently proposed to be conducted. No Acquired Company has developed jointly with

any other Person any Company IP with respect to which such other Person has any rights. Without limiting the generality of the foregoing:

> **(i)**     All documents and instruments necessary to establish, perfect and maintain the rights of the Acquired Companies in the Company IP that (A) is incorporated into any Company Product or Service, and (B) was developed by or on behalf of, or otherwise acquired by, any Acquired Company, have been validly executed, delivered and filed in a timely manner with the appropriate Governmental Body.

> **(ii)**     Each Person who is or was an employee or contractor of any Acquired Company who contributed to the development of any of the Company IP did so pursuant to a valid, enforceable agreement containing an assignment of Intellectual Property Rights to such Acquired Company and confidentiality provisions protecting the Company IP.  No current or former member, manager, officer, director, contractor or employee of any Acquired Company has any claim, right (whether or not currently exercisable) or interest to or in any Company IP or has made any such claim with respect to any Company IP.  No employee of any Acquired Company is: (A) bound by or otherwise subject to any Contract restricting him from performing his duties for any Acquired Company; or (B) in breach of any Contract with any former employer or other Person concerning Intellectual Property Rights or confidentiality due to his activities as an employee of any Acquired Company.  Neither the employment of any employee, nor the use by any Acquired Company of the services of any consultant or independent contractor subjects any Acquired Company to any liability to any third party for improperly soliciting such employee, consultant or independent contractor to work for any Acquired Company, whether such liability is based on contractual or other legal obligations to such third party.

> **(iii)**     No funding, facilities or personnel of any Governmental Body or any public or private university, college or other educational or research institution were used, directly or indirectly, to develop or create, in whole or in part, any Company IP developed by or on behalf of any Acquired Company.

> **(iv)**     No Acquired Company is now or has it ever been a member of, or a contributor to, any industry standards body, consortium, open source organization or any similar organization that requires or obligates any Acquired Company, or could reasonably be expected to require or obligate any Acquired Company, to grant or offer to any other Person any license or right to any Company IP or covenant not to sue another person based on Company IP.

> **(v)**     Each Acquired Company has taken all reasonable steps and precautions necessary to maintain the confidentiality of and otherwise protect and enforce its rights in all proprietary information pertaining to the Company IP or any Company Product or Service that any Acquired Company holds, or purports to hold, as a trade secret.

> **(vi)**     The Acquired Companies own, or possess valid and enforceable rights to use, and after the Closing, the Parent shall own or possess, the same valid and enforceable rights to use, all Company IP as necessary for the conduct of the Business.

> **(h)**     All Company IP developed by or on behalf of, or owned by any Acquired Company, and to the Knowledge of the Company all Company IP licensed to any Acquired Company, is valid, subsisting, and enforceable.  Without limiting the generality of the foregoing:

> **(i)**     Each U.S. patent application and U.S. patent included in the Company IP in which any Acquired Company has or purports to have an ownership interest was filed within one year

of a printed publication, public use or offer for sale of each invention described in the U.S. patent application or U.S. patent.  Each foreign patent application and foreign patent included in the Company IP in which any Acquired Company has or purports to have an ownership interest was filed or claims priority to a patent application filed prior to each invention described in the foreign patent application or foreign patent being made available to the public.

      **(ii)**     No Acquired Company has engaged in patent or copyright misuse of the Intellectual Property Rights of any third party, nor any fraud or inequitable conduct in connection with any Company IP that is Registered IP.

      **(iii)**    No trademark or trade name included in the Company IP conflicts or interferes with any trademark or trade name owned, used or applied for by any other Person.  No event or circumstance (including a failure to exercise adequate quality controls and an assignment in gross without the accompanying goodwill) has occurred or exists that has resulted in, or could reasonably be expected to result in, the abandonment of any trademark (whether registered or unregistered) owned, used or applied for by any Acquired Company .

      **(iv)**    Each item of Company IP that is Registered IP that has been issued to, or applied for in the name of, any Acquired Company is and at all times has been duly maintained (including the payment of maintenance fees) as required to maintain such item of Company IP in full force and effect.  No application for a patent or a copyright, or trademark registration or any other type of Registered IP filed by or on behalf of any Acquired Company has been abandoned, allowed to lapse, or rejected.  Part 2.9(h)(iv) of the Disclosure Schedule accurately identifies and describes each action, filing and payment that must be taken or made on or before the date that is 120 days after the Closing Date in order to maintain such item of Company IP in full force and effect.

      **(v)**     No interference, opposition, reissue, reexamination, or other Legal Proceeding is or has been pending or, to the Knowledge of the Company, threatened, in which the ownership, scope, validity, or enforceability of any Company IP is being, has been, or could reasonably be expected to be contested or challenged.

      **(i)**     To the Knowledge of the Company, no Person has infringed, misappropriated or otherwise violated, and no Person is currently infringing, misappropriating or otherwise violating, any Company IP.  Part 2.9(i) of the Disclosure Schedule accurately identifies (and the Company has provided to Parent a complete and accurate copy of) each letter or other written or electronic communication or correspondence that has been sent or otherwise delivered by or to any Acquired Company, or any Representative of any Acquired Company, regarding any actual, alleged or suspected infringement or misappropriation of any Company IP, and provides a brief description of the current status of the matter referred to in such letter, communication, or correspondence.

      **(j)**     Neither the execution, delivery, or performance of this Agreement (or any of the agreements execute in connection with the Transactions) nor the consummation of the Transactions will, with or without notice or lapse of time, result in, or give any other Person the right or option to cause or declare: (i) a loss of, or Encumbrance on, any Company IP; (ii) the release, disclosure, or delivery of any Company IP by or to any escrow agent or other Person; (iii) the grant, assignment or transfer to any other Person of any license or other right or interest under, to or in any of the Company IP; (iv) any right of any third party to terminate or alter any Acquired Company's or, after the Closing, Parent's rights in and to any Company IP; or (v) a breach of any of the Licenses-In listed or required to be listed in Part 2.9(c) of the Disclosure Schedule.

(k)      In connection with the operation of the Business, no Acquired Company has infringed (directly, contributorily, by inducement, or otherwise), misappropriated or otherwise violated or made unlawful use of (i) any Intellectual Property Right of any other Person, other than any rights of any Person under any patent, and (ii) rights of any Person under any patent.  No Company IP or Company Product or Service, or any method or process used in the design, development, marketing, distribution, execution, implementation, provision, licensing or sale of any Company Product or Service, has ever infringed, violated or made unlawful use of (A) any Intellectual Property Right of, or contained any Intellectual Property misappropriated from, any other Person, other than any rights of any Person under any patent, and (B) rights of any Person under any patent.  There is no legitimate basis for a claim that any Acquired Company, any Company IP or any Company Product or Service has infringed or misappropriated any Intellectual Property Right of another Person or engaged in unfair competition or that any Company IP or Company Product or Service, or any method or process used in the design, development, marketing, distribution, execution, implementation, provision, licensing or sale of any Company Product or Service, infringes, violates or makes unlawful use of any Intellectual  Property Right of, or contains any Intellectual Property misappropriated from, any other Person.  In addition:

(i)      No infringement, misappropriation, or similar claim or Legal Proceeding involving or relating to any Company IP developed by or for, or owned by, any Acquired Company, or any Company Product or Service, is pending or, to the Knowledge of the Company, threatened against any Acquired Company or against any other Person who is or may be entitled to be indemnified, defended, held harmless or reimbursed by any Acquired Company with respect to such claim or Proceeding.  Except as listed in Part 2.9(k) of the Disclosure Schedule, no Acquired Company has received any notice or other communication (in writing or otherwise) relating to any actual, alleged or suspected infringement, misappropriation or violation by any Acquired Company, any of its employees or agents, or any Company IP or Company Product or Service of any Intellectual Property Rights of another Person, including any letter or other communication suggesting or offering that any Acquired Company obtain a license to any Intellectual Property Right of another Person.

(ii)      No Acquired Company is bound by any Contract relating to the Business or any Company Products or Services to indemnify, defend, hold harmless or reimburse any other Person with respect to, and has not otherwise assumed or agreed to discharge or otherwise take responsibility for, any existing or potential intellectual property infringement, misappropriation, or similar claim.

(iii)      No claim or other Legal Proceeding involving any Intellectual Property or Intellectual Property Right licensed to any Acquired Company under the Licenses-In in connection with the Business or any of the Company Products or Services is pending or, to the Knowledge of the Company, has been threatened, except for any such claim or Proceeding that, if adversely determined, would not adversely affect: (i) the use or exploitation of such Intellectual Property or Intellectual Property Right by any Acquired Company; or (ii) the design, development, marketing, distribution, execution, implementation, provision, licensing or sale of any Company Product or Service.

(l)      None of the software (including all executable versions of such software and any firmware or other software embedded in hardware devices) that is or ever has been owned, developed (or currently being developed), owned by or licensed to any Acquired Company and used, marketed, distributed, licensed or sold by any Acquired Company in connection with the Business (including any software that is part of, is distributed with or is used in the design, development, production, distribution, testing, maintenance or support of any Company Product or Service, but excluding any third-party software that is generally available on standard commercial terms and is licensed to any Acquired Company solely for internal use on a non-exclusive basis) (collectively, the "**Company Software**"): (i) contains any bug, defect or error (including any bug, defect or error relating to or resulting from the

display, manipulation, processing, storage, transmission or use of date data) that materially and adversely affects the use, functionality or performance of such Company Software or any Company Product or Service or system containing or used in conjunction with such Company Software; or (ii), fails to comply, or would cause any Acquired Company to fail to comply, in any material respect with any applicable warranty or other contractual commitment relating to the use, functionality or performance of such Company Software or any Company Product, Service or System containing or used in conjunction with such Company Software.

(m)    No Company Software contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus" or "worm" (as such terms are commonly understood in the software industry) or any other code designed or intended to have any of the following functions: (i) disrupting, disabling, harming or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed; or (ii) damaging or destroying any data or file without the user's consent.

(n)    The Company Source Code contains annotations and programmers comments and has been documented in a professional manner that is both: (i) consistent with customary code annotation conventions and best practices in the software as a service industry; and (ii) reasonably sufficient to enable a programmer of reasonable skill and competence to understand, analyze and interpret program logic, correct errors and improve, enhance, modify and support the Company Software in a manner consistent with the Company's past practices. No Company Source Code has been delivered, licensed or made available to any escrow agent or other Person who is not, as of the date of this Agreement, an employee of any Acquired Company. No Acquired Company has any duty or obligation (whether present, contingent, or otherwise) to deliver, license or make available any Company Source Code to any escrow agent or other Person. No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, result in the delivery, license, or disclosure of any Company Source Code to any other Person.

(o)    Part 2.9(o) of the Disclosure Schedule accurately identifies and describes: (i) each item of Open Source Code that is contained in or distributed with the Company Product (including but not limited to any Company Software) or Services or from which any part of any Company Product or Service is derived; (ii) the applicable license terms for each such item of Open Source Code; and (iii) the Company Product or Service or Company Products or Services to which each such item of Open Source Code relates. Each Acquired Company has complied with all of the terms and conditions of each applicable Open Source License, including all requirements pertaining to attribution and copyright notices.

(p)    No Company Product (including but not limited to any Company Software) or Service contains, is derived from, is distributed with, or is linked to, is combined with, or otherwise uses Open Source Code that is licensed under any terms that: (i) impose or could impose a requirement or condition that any Acquired Company grant a license under, or refrain from asserting any one or more of its patent rights or that any Company Product or Service or part thereof: (A) be disclosed or distributed in Source Code form; (B) be licensed for the purpose of making modifications or derivative works; or (C) be redistributable at no charge; or (ii) otherwise impose or could impose any other limitation, restriction or condition on the right or ability of any Acquired Company to use or distribute any Company Product or Service (including any requirements to advertise or include attributions with respect to such Open Source Code).

(q)    Each Company Product or Service conformed and complied with all Applicable Law at the time it was sold, distributed or made available. To the Knowledge of the Company, no

Acquired Company has received any notice or other communication (in writing or otherwise) asserting that such Acquired Company has breached its warranty or other obligations to any customer of the Acquired Company in any material respect with respect to a Company Product or Service.

(r)    Each Acquired Company is, and has at all times been, in compliance with all Privacy Legal Requirements in connection with its operation of the Business. No Acquired Company has received any notice or other communication from any Governmental Body regarding any actual or possible violation of, or failure to comply with, any Privacy Legal Requirement.

(s)    Part 2.2.9(s) of the Disclosure Schedule contains each Company Privacy Policy in effect at any time since the inception of each Acquired Company and identifies, with respect to each Company Privacy Policy: (i) the period of time during which such Company Privacy Policy was or has been in effect; (ii) the Company Customer Website on which the Company Privacy Policy was or is posted; (ii) whether the terms of a later Company Privacy Policy apply to the data or information collected under such privacy policy; and (iv) if applicable, the mechanism (such as opt-in, opt-out or notice only) used to apply a later Company Privacy Policy to data or information previously collected under such privacy policy. Each Acquired Company has complied at all times with all of the Company Privacy Policies, and with all Privacy Legal Requirements pertaining to privacy, User Data or Personal Data in connection with its operation of the Business. Neither the execution, delivery nor performance of this Agreement or any of the other agreements executed in connection with the Transactions nor the consummation of Transactions, nor Parent's possession or use of any Company Data in a manner consistent with each Acquired Company's past practices will result in any violation of any Company Privacy Policy or any Privacy Legal Requirement.

(t)    Part 2.9(t) of the Disclosure Schedule lists any restrictions on the rights of the Acquired Companies to use any Company Data. Except as set forth on Part 2.2.9(t) of the Disclosure Schedule, the Company Data is owned by the Acquired Companies, free and clear of all Encumbrances, and is not subject to any Contract.

(u)    Each Acquired Company has complied at all times with all Legal Requirements applicable to referrals made to attorneys and fee-sharing between attorneys and non-attorneys.

(v)    Each Acquired Company has complied at all times with the Telephone Consumer Protection Act (TCPA).

**2.10    Contracts**.

(a)    Part 2.10(a) of the Disclosure Schedule sets forth a complete and accurate list of the following Company Contracts (each such Company Contract required to be disclosed in Part 2.10(a) of the Disclosure Schedule, a "**Material Contract**" and collectively, the "**Material Contracts**"):

(i)    any employment or consulting agreement, contract or commitment with any employee or consultant, any agreement, contract or commitment to grant any severance or termination pay to any Person, other than (A) offer letters in the Company's standard form that do not contain severance, change in control or similar payments and (B) agreements in the Company's standard form relating to acquisition of equity securities of the Company that do not involve any ongoing obligations of the Company thereunder;

(ii)    any agreement or plan, including any unit option plan, equity appreciation rights plan or equity purchase plan, any of the benefits of which will be increased, or the vesting of benefits of

17.

which will be accelerated, by the occurrence of any of the Transactions or the value of any of the benefits of which will be calculated on the basis of any of the Transactions;

        **(iii)**    any fidelity or surety bond or completion bond;

        **(iv)**    any lease of personal property currently in effect;

        **(v)**    any agreement of indemnification or guaranty;

        **(vi)**    any Contract relating to capital expenditures;

        **(vii)**    any Contract relating to the disposition or acquisition of material assets or any interest in any business enterprise;

        **(viii)**    any mortgages, indentures, guarantees, loans or credit agreements, security agreements or other agreements or instruments relating to the borrowing of money or extension of credit;

        **(ix)**    any Contract granting to any third party any most favored nation pricing, exclusive sales, distribution, marketing, or other exclusive rights, rights of refusal, rights of first negotiation, or similar rights or otherwise restricting the freedom of the Company: (i) to compete with any other Person; (ii) to acquire any product or other asset or any services from any other Person, to sell any product or other asset to or perform any services for any other Person, or to transact business or deal in any other manner with any other Person; or (iii) to develop or distribute any technology;

        **(x)**    any pending purchase order or Contract for the purchase of materials;

        **(xi)**    any dealer, distribution, joint marketing, strategic alliance, affiliate or development agreement;

        **(xii)**    all licenses, sublicenses and other Contracts pursuant to which any Person is authorized to use Company Intellectual Property;

        **(xiii)**    other than "shrink wrap" and similar generally available commercial end-user licenses to software that is not redistributed with or used in the development or provision of the Products that have an individual acquisition cost of $2,500 or less, all licenses, sublicenses and other Company Contracts pursuant to which any Acquired Company acquired or is authorized to use any third-party Intellectual Property Rights;

        **(xiv)**    any sales representative, original equipment manufacturer, manufacturing, value added reseller or independent software vendor or other agreement for use or distribution of the products, technology or services of any Acquired Company;

        **(xv)**    any Contract that involves in excess of $5,000 individually or $10,000 in the aggregate in the current or any future fiscal year and is not cancelable without penalty within 30 days; or

        **(xvi)**    any other Contract that is material to the Company.

        **(b)**    Each Material Contract is a valid and binding agreement of the applicable Acquired Company, enforceable against the each of the parties thereto in accordance with its terms and is in full force and effect with respect to each of the parties thereto.  Each Acquired Company is in

compliance with and has not breached, violated or defaulted under, or received notice that it has breached, violated or defaulted under, any of the terms or conditions of any such Material Contract and no event has occurred that, with notice or lapse of time, would constitute a breach, violation or default under any of the terms or conditions of such Material Contract. Each Acquired Company has fulfilled all material obligations required to have been performed by the Company pursuant to each Material Contract.

**2.11    Compliance with Legal Requirements; Governmental Authorizations.**

(a)    Each Acquired Company is, and has at all times been, in compliance in all respects with each Legal Requirement that is applicable to it or to the conduct of its business or the ownership or use of any of its assets. No event has occurred, and no condition or circumstance exists, that could reasonably be expected to (with or without notice or lapse of time) constitute or result directly or indirectly in a violation by any Acquired Company of, or a failure on the part of any Acquired Company to comply with, any material Legal Requirement. No Acquired Company has received, at any time, any notice or other communication (in writing or otherwise) from any Governmental Body or any other Person regarding any actual, alleged, possible or potential violation of, or failure to comply with, any Legal Requirement.

(b)    The Governmental Authorizations held by each Acquired Company are valid, in full force and effect and constitute all of the Governmental Authorizations necessary to enable each Acquired Company to conduct the Business. Each Acquired Company is and has at all times been in compliance in all material respects with all of the terms and requirements of each such Governmental Authorization, and no event has occurred that could reasonably be expected to (with or without notice or lapse of time) result in a violation of any requirement of any such Governmental Authorization, or result in the termination or modification of any such Governmental Authorization.

(c)    Each Acquired Company is, and has at all times been, in compliance in all respects with all Legal Requirements relating to the export, re-export, import and transfer of products, commodities, services and technology from the jurisdiction of one Governmental Body to another.

**2.12    Certain Business Practices.**  No Acquired Company, and (to the Knowledge of the Company) no advisor, officer, agent or employee of any Acquired Company, has (a) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, (b) made any unlawful payment to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns or violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, or (c) made any other unlawful payment.

**2.13    Tax Matters.**

(a)    Each Acquired Company has timely paid all Taxes due and owning by them. Each Acquired Company has duly and timely filed (or will file prior to the Closing) all Tax Returns required to be filed by or on its behalf prior to Closing (taking into account any extension of time within which to file a Tax Return), and all such Tax Returns are true, correct, and complete in all material respects and prepared in substantial compliance with all applicable Legal Requirements. The assets of each Acquired Company are not subject to any Encumbrances for Taxes, except Permitted Encumbrances. Each Acquired Company has withheld and paid all Taxes required to be withheld and paid in connection with any amounts paid or owing to any employee, other service provider, creditor, equity holder or other third party. No Acquired Company is or has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

**(b)**       There are no pending or, to the Company's Knowledge, threatened in writing, proceedings with respect to Taxes, and there are no outstanding waivers or extensions of statutes of limitations with respect to assessments of Taxes, of any Acquired Company.  No Acquired Company has received from any Tax authority any (i) written notice indicating an intent to open an audit or other review or (ii) written notice of deficiency or proposed adjustment of or any amount of Tax proposed, asserted, or assessed against any Acquired Company.  No claim has ever been made by a Taxing authority in a jurisdiction where any Acquired Company does not file Tax Returns that such Acquired Company is or may be subject to taxation by that jurisdiction.

**(c)**       Each Acquired Company is now, and at all times from the date of its organization has been, classified as a partnership or disregarded for U.S. federal income tax purposes under Section 301.7701-3 of the Treasury Regulations.  All income Tax Returns have been prepared consistently with the preceding sentence.  The Company has previously made available to Parent complete and accurate copies of (i) all U.S. federal and state income Tax Returns filed by or on behalf of each Acquired Company as requested in writing by Parent prior to the date hereof and (ii) all ruling requests, private letter rulings, notices of proposed deficiencies, closing agreements, settlement agreements and any similar documents or communications sent or received by any Acquired Company relating to Taxes.

**(d)**       No Acquired Company had any liabilities for unpaid Taxes that were not been accrued or reserved on the Interim Balance Sheet as of the Interim Balance Sheet Date, and no Acquired Company has incurred any liability for Taxes since the Company Balance Sheet Date other than in the ordinary course of business.

**(e)**       No Acquired Company has any operations outside the United States nor has it ever maintained a "permanent establishment" (within the meaning of applicable income Tax conventions) outside the United States.

**(f)**       No Acquired Company will be required to include any item of income in, or exclude any item of deduction from, Taxable income for any Taxable period (or portion thereof) after the Closing Date as a result of any (i) change of accounting method for a Taxable period ending on or prior to the Closing (including by reason of the application of  Section 481 of the Code (or any corresponding or similar Legal Requirement), (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar Legal Requirement) executed on or prior to the Closing, (iii) installment sale or open transaction disposition made on or prior to the Closing, or (iv) material prepaid amount received on or prior to the Closing.

**(g)**       No Acquired Company is a party to or bound by any Tax indemnity, Tax sharing, Tax allocation or similar agreement.   For the purposes of the preceding sentence, the following agreements shall be disregarded: (i) commercially reasonable agreements providing for the allocation or payment of real property Taxes attributable to real property leased or occupied by an Acquired Company and (ii) commercially reasonable agreements not primarily related to Taxes for the allocation or payment of personal property Taxes, sales or use Taxes or value added Taxes with respect to personal property leased, used, owned, purchased or sold in the ordinary course of business.  No Acquired Company has any liability for the Taxes of any Person as a transferee or successor or otherwise by operation of law.

**(h)**       No Acquired Company has consummated, has participated in, or is currently participating in any transaction that was or is a "Tax shelter" or "listed transaction" as defined in Sections 6662, 6662A, 6011, 6012, 6111 or 6707A of the Code or the Treasury Regulations promulgated thereunder.

**(i)**      No Acquired Company is obligated to make any payments, or is a party to any Contract that would result in the Acquired Company making any payments that, individually or collectively, would not be deductible by reason of Section 280G of the Code (or any corresponding provision of state, local or non-U.S. law).

**2.14**    **Employee and Labor Matters; Benefit Plans.**

**(a)**      The Company has provided an accurate and complete list to Parent that sets forth the name, title, hire date and annual gross compensation of each current Company Employee, (including wages, salary, commissions, fringe benefits, bonuses and other payments or benefits of any type) in 2013 and 2014 to date.  No Acquired Company is a party to or bound by any employment agreement, union contract, collective bargaining agreement or similar Contract, and the employment of each current Company Employee is terminable by the Company at will.  To the Knowledge of the Company, (a) no current Company Employee, intends to terminate his or her employment or relationship with any Acquired Company or intends not to undertake employment or service with Parent if given a reasonably satisfactory offer and (b) no current Company Employee, is a party to or is bound by any confidentiality agreement, noncompetition agreement or other Contract with any Person (other than the Acquired Companies) that could reasonably be expected to have an adverse effect on the performance by such Company Employee, of any of his or her duties with respect to any Acquired Company or the Business.  Each Acquired Company's relationships with all individuals who act on their own as contractors or other service providers can be terminated at any time for any reason without amounts being owed to such individuals, other than with respect to compensation or payments accrued before the notice of termination.  All individuals who perform services for any Acquired Company and who have been classified as other than employees have been properly classified under the Code and all applicable state Laws.  No former Company Employee is receiving or is scheduled to receive (nor any spouse or other dependent is receiving or is scheduled to receive) any benefits (whether from any of the Acquired Companies or otherwise) relating to such former employee's employment or relationship with any Acquired Company.  The Company has disclosed all written employee handbooks, policies, programs and arrangements of the Acquired Companies to the Parent.

**(b)**      Part 2.14(b) of the Disclosure Schedule identifies each Company Employee Plan. Each Company Employee Plan is being and has at all times been operated and administered, in all material respects, in compliance with the provisions thereof.  Each contribution or other payment that is required under the terms of the applicable Company Employee Plan or Legal Requirements have been accrued or made under or with respect to any Company Employee Plan has been duly accrued and/or made on a timely basis.  Each Company Employee Plan has at all times been operated and administered, in all material respects, in compliance with all applicable Legal Requirements.  No Company Employee Plan is subject to Title IV of ERISA.  The Company Employee Plan that is intended to meet the requirements of a "qualified plan" under Code Section 401(a) received a determination or approval letter from the Internal Revenue Service or may rely on an opinion letter issued by the Internal Revenue Service with respect to a prototype plan to the effect that it meets the requirements of Code Section 401(a).

**(c)**      Each nonqualified deferred compensation plan of each Acquired Company complies, in all material respects, with the requirements of Section 409A of the Code and the regulations thereunder by its terms and has been operated in accordance with such requirements.  No nonqualified deferred compensation plan has been "materially modified" (within the meaning of IRS Notice 2005-1) based on a reasonable interpretation of the term "materially modified" or, if materially modified, such plans, as modified, are compliant with Section 409A of the Code.  No Company Employee Agreement and no Company Employee Plan has or would reasonably be expected to result in gross income inclusion pursuant to Section 409A(a)(1)(A).

21.

(d)      There are no claims or Legal Proceedings pending or, to the Knowledge of the Company, threatened against any Company Employee Plan or against the assets of any Company Employee Plan.  Each Company Employee Plan can be amended, terminated or otherwise discontinued after the Closing in accordance with its terms, without liability to Parent or any Acquired Company (other than ordinary administration expenses), subject to applicable Legal Requirements.  There are no audits, inquiries or Legal Proceedings pending or, to the Knowledge of the Company, threatened by the IRS, the DOL, or any other Governmental Body with respect to any Company Employee Plan.  No Acquired Company has incurred any penalty or tax with respect to any Company Employee Plan under Section 502(i) of ERISA, under Sections 4975 through 4980 of the Code or under any other applicable Legal Requirement.

(e)      No Acquired Company has ever maintained, established, sponsored, participated in, or contributed to any: (i) Company Pension Plan subject to Title IV of ERISA; (ii) "multiemployer plan" within the meaning of Section (3)(37) of ERISA; or (iii) Company Pension Plan in which stock of any of the Acquired Companies is or was held as a plan asset.

(f)      No Company Employee Plan provides, or represents any liability of any of the Acquired Companies to provide, retiree life insurance, retiree health benefits or other retiree employee welfare benefits to any Person for any reason, except as may be required by COBRA or other applicable Legal Requirements.  No Acquired Company has ever represented, promised or contracted (whether in oral or written form) to any Company Employee (either individually or to Company Employees as a group) or any other Person that any such Company Employee or other Person would be provided with retiree life insurance, retiree health benefits or other retiree employee welfare benefits, except to the extent required by applicable Legal Requirements.

(g)      Except as expressly required or provided by this Agreement, neither the execution or delivery of this Agreement nor the consummation of any of the Transactions will (either alone or upon the occurrence of any additional or subsequent events) constitute an event under any Company Employee Plan, Company Employee Agreement, trust or loan that will or would reasonably be expected to result (either alone or in connection with any other circumstance or event) in any payment (whether of severance pay or otherwise), acceleration of any right, obligation or benefit, forgiveness of indebtedness, vesting, distribution, increase in benefits or obligation to fund benefits with respect to any Company Employee.

(h)      No Acquired Company has: (i) violated or otherwise failed to comply with any Legal Requirement respecting employment, employment practices, terms and conditions of employment or wages and hours, including the health care continuation requirements of COBRA, the requirements of FMLA, the requirements of HIPAA and the provisions of any similar Legal Requirement; (ii) failed to withhold or report any amounts required by applicable Legal Requirements or by Contract to be withheld or reported with respect to wages, salaries and other payments to Company Employees; (iii) become liable for any arrears of wages or any taxes or any penalty for failure to comply with the Legal Requirements applicable to any of the foregoing; and (iv) become liable for any payment to any trust or other fund governed by or maintained by or on behalf of any Governmental Body with respect to unemployment compensation benefits, social security or other benefits or obligations for Company Employees (other than routine payments to be made in the normal course of business and consistent with past practice).  There are no pending or, to the Knowledge of the Company, threatened or reasonably anticipated claims or Legal Proceedings against any Acquired Company under any worker's compensation policy or long-term disability policy.

(i)    To the Knowledge of the Company, no unitholder of the Company and no Company Employee, is obligated under any Contract or subject to any Order that would interfere with such Person's efforts to promote the interests of the Acquired Companies or that would interfere with the Business.  Neither the execution nor the delivery of this Agreement, nor the carrying on of the Business nor any activity of such unitholder or Company Employees in connection with the carrying on of the Business, to the Knowledge of the Company, will conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default under, any Contract under which any of such unitholders or Company Employees has any rights or obligations.

**2.15    Environmental Matters.** Each Acquired Company possesses all permits and other Governmental Authorizations required under applicable Environmental Laws, and is in compliance with the terms and conditions thereof.  No Acquired Company has received any notice or other communication (in writing or otherwise), whether from a Governmental Body, citizens group, employee or otherwise, that alleges that any Acquired Company is not in compliance with any Environmental Law.

**2.16    Insurance.**  Part 2.16 of the Disclosure Schedule identifies each insurance policy maintained by, at the expense of or for the benefit of each Acquired Company and identifies each material claims (including any workers' compensation claims) made thereunder.  Each of the insurance policies identified in Part 2.16 of the Disclosure Schedule is in full force and effect.  No Acquired Company has received any notice or other communication (in writing or otherwise) regarding any actual or possible (a) cancellation or invalidation of any insurance policy, (b) refusal of any coverage or rejection of any claim under any insurance policy, or (c) material adjustment in the amount of the premiums payable with respect to any insurance policy.

**2.17    Related Party Transactions.**  (a) No Related Party has, and no Related Party has had, any direct or indirect interest in any material asset used in or otherwise relating to the Business; (b) no Related Party is, or has been, indebted to any Acquired Company; (c) to the Knowledge of the Company, no Related Party has entered into, or has had any direct or indirect financial interest in, any material Contract, transaction or business dealing involving any Acquired Company ; (d) no Related Party is, to the Knowledge of the Company, competing directly or indirectly, with any Acquired Company; and (e) no Related Party has, to the Knowledge of the Company, any claim or right against any Acquired Company (other than rights to receive compensation for services performed as an employee of an Acquired Company).  (For purposes of this Agreement, each of the following shall be deemed to be a "**Related Party**": (i) each Unitholder; (ii) each individual who is, or who has at any time been, an officer or advisor of any Acquired Company; (iii) each member of the immediate family of each of the Person referred to in clauses "(i)" and "(ii)" above; and (iv) any trust or other Entity (other than any Acquired Company) in which any one of the Persons referred to in clauses "(i)", "(ii)" and "(iii)" above holds (or in which more than one of such individuals collectively hold), beneficially or otherwise, a material voting, proprietary or equity interest.)

**2.18    Legal Proceedings; Orders.**

(a)    There have been no previous Legal Proceedings, there is no pending Legal Proceeding, and no Person, to the Knowledge of the Company, has threatened to commence any Legal Proceeding, that involves any Acquired Company or that otherwise relates to or might affect the Business, its prospects or any of the assets or properties of any Acquired Company (whether or not such Acquired Company is named as a party thereto), and no event has occurred that could reasonably be expected to give rise to or serve as a basis for the commencement of any such Legal Proceeding.  There is no Order to which any Acquired Company, or any of its assets, is or may be subject; and no Related Party is subject to any Order that relates to any Acquired Company or to any of its assets.  There is no proposed Order

that, if issued or otherwise put into effect, could reasonably be expected to have an adverse effect on the Business, prospects, assets or properties of any Acquired Company. To the Knowledge of the Company, no event has occurred, and no claim, dispute or other condition or circumstance exists that could reasonably be expected to, give rise to or serve as a basis for the commencement of any such Legal Proceeding.

(b)     To the Knowledge of the Company, there is no Order to which any Acquired Company, or any of the assets owned by any Acquired Company, is subject. To the Knowledge of the Company, no officer or key employee of any Acquired Company is subject to any Order that prohibits such officer or other employee from engaging in or continuing any conduct, activity or practice relating to the Business.

### 2.19    Authority; Binding Nature of Agreement.

(a)     The Company has the limited liability power and authority to enter into and to perform its obligations under this Agreement and under each other agreement, document or instrument referred to herein or contemplated by this Agreement to which the Company is or will be a party; and the execution, delivery and performance by the Company of this Agreement and of each such other agreement, document or instrument have been duly authorized by all necessary action on the party of the Company and its board of managers. This Agreement and each other agreement, document or instrument referred to in or contemplated by this Agreement to which the Company is or will be a party constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to (i) laws of general application relating to bankruptcy, insolvency, reorganization, moratorium and the enforcement of creditors' rights generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies (the "**Enforceability Exception**").

(b)     The board of managers of the Company (at a meeting duly called and held) has (a) unanimously determined that the Agreement is advisable and fair and in the best interests of the Company and the Unitholders and (b) unanimously authorized and approved the execution, delivery and performance of this Agreement by the Company.

(c)     No state or foreign takeover statute or similar Legal Requirement applies or purports to apply to the Company's execution and performance of this Agreement or any of the Transactions.

(d)     Each Key Employee has all requisite power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document or instrument referred to herein or contemplated by this Agreement to which such Key Employee is a party. The execution and delivery of this Agreement and each other agreement, document or instrument referred to herein or contemplated by this Agreement to which such Key Employee is a party have been duly authorized and approved by all necessary action on the part of such Key Employee and no other proceeding on the party of such Key Employee is necessary to authorize this Agreement or and such other agreements, documents or instruments referred to herein or contemplated by this Agreement to which such Key Employee is a party. This Agreement and each other agreement, document or instrument referred to herein or contemplated by this Agreement to which such Key Employee is a party have been duly executed and delivered by each Key Employee and constitute valid, legal and binding agreements of such Key Employee (assuming that this Agreement and each other agreement, document or instrument referred to herein or contemplated by this Agreement to which such Key Employee is a party have been validly authorized, executed and delivered by the other Persons party thereto), enforceable against such Key Employee in accordance with their terms, subject to the Enforceability Exception.

24.

**2.20    Non-Contravention; Consents**.  Neither the execution, delivery or performance of this Agreement or any of the other agreements, documents or instruments referred to in or contemplated by this Agreement by the Company nor the consummation by the Company of the Transactions will (with or without notice or lapse of time):

(a)    contravene, conflict with or result in a violation of (i) any of the provisions of the operating agreement or other charter or organizational documents of any Acquired Company, or (ii) any resolution adopted by the members, stockholders, the board of advisors or the board of directors of any Acquired Company;

(b)    contravene, conflict with or result in a violation of any Legal Requirement or any Order to which any Acquired Company, or any of the assets owned or used by any Acquired Company, is or may be subject;

(c)    contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by any Acquired Company or that otherwise relates to the Business or to any of the assets owned or used by any Acquired Company;

(d)    contravene, conflict with or result in a violation or breach of, or result in a default under, any provision of any Company Contract or give any Person the right to (i) declare a default or exercise any remedy under any such Contract, (ii) a rebate, chargeback, penalty or change in delivery schedule under any such Contract, (iii) accelerate the maturity or performance of any obligation under any such Contract, or (iv) cancel, terminate or modify any term of any such Contract;

(e)    result in the imposition or creation of any Encumbrance upon or with respect to any material asset owned or used by any Acquired Company (except for Permitted Encumbrances); or

(f)    result in the disclosure or delivery to any escrow holder or other Person of any Company Source Code, or the transfer of any material asset of the Company to any Person.

No Acquired Company has, nor will it be required to make any filing with or give any notice to, or to obtain any Consent from, any Person in connection with (x) the execution, delivery or performance of this Agreement or any of the other Transactions or (y) the consummation of the Merger or any of the other Transactions.  (For purposes of this Agreement, any Acquired Company will be deemed to be or to have been "required" to obtain a Consent if the failure to obtain such Consent (i) could result in the imposition of any liability or obligation on, or the expansion of any liability or obligation of, any Acquired Company, (ii) could result in the termination, modification or limitation of any contractual or other right of any Acquired Company, or (iii) could otherwise have an adverse effect on the business, condition, capitalization, assets, Intellectual Property, liabilities, results of operations, financial performance or prospects of any Acquired Company.)

**2.21    Financial Advisor**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with this Agreement or any of the other Transactions based upon arrangements made by or on behalf of any Acquired Company.

**2.22    Full Disclosure**.  This Agreement (including the Disclosure Schedule) does not:  (a) contain any representation, warranty or information that is false or misleading with respect to any material fact; or, (b) to the Knowledge of the Company, omit to state any material fact necessary in order to make the representations, warranties and information contained and to be contained herein and therein (in the

light of the circumstances under which such representations, warranties and information were or will be made or provided) not false or misleading. There is no information or other fact that is or may become materially adverse to the business, condition, assets, capitalization, Intellectual Property, Intellectual Property Rights, liabilities, operations, results of operations, financial performance or prospects of the Company.

**SECTION 3.    REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB**

Parent and Merger Sub represent and warrant to the Company as follows:

**3.1    Due Organization, Standing and Power.**  Parent is a corporation duly organized, validly existing and in good standing under the laws of Delaware.  Merger Sub is a limited liability company duly organized, validly existing and in good standing under the laws of Illinois.  Each of Parent and Merger Sub has all requisite corporate or limited liability company, as applicable, power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted, and is duly qualified to do business and, where applicable as a legal concept, is in good standing as a foreign corporation or limited liability company, as applicable, in each jurisdiction in which the character of the properties it owns, operates or leases or the nature of its activities makes such qualification necessary.

**3.2    Authority; Binding Nature of Agreement.**  Each of Parent and Merger Sub has the corporate or limited liability company, as applicable, power and authority to enter into and to perform its obligations under this Agreement and under each other agreement contemplated by this Agreement to which it is or will be a party and the execution, delivery and performance by Parent and Merger Sub of this Agreement and of each such other agreement have been duly authorized by all necessary action on the part of Parent and Merger Sub.  Assuming the due authorization and execution by the other parties hereto and thereto, this Agreement and each other agreement contemplated by this Agreement to which Parent or Merger Sub is or will be a party constitutes the legal, valid and binding obligation of each of Parent or Merger Sub, enforceable against Parent or Merger Sub in accordance with its terms, subject to the Enforceability Exception.

**3.3    Non-Contravention; Consents.**  Neither the execution and delivery of this Agreement by Parent or Merger Sub or any of the agreements contemplated by this Agreement to which Parent or Merger Sub is or will be a party nor the consummation by Parent or Merger Sub of the Transactions will, directly or indirectly, with or without notice or lapse of time:  (a) violate any Legal Requirement to which Parent or Merger Sub is subject; (b) violate any of the organizational documents of Parent or Merger Sub; or (c) violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of or give any person or entity the right to accelerate the maturity or performance of, or to cancel, terminate, modify or exercise any remedy under, any contract to which Parent or Merger Sub is a party or by which Parent or Merger Sub is bound.

**SECTION 4.    TAX MATTERS**

**4.1    Pre-Closing Tax Returns.**  Parent shall prepare and file (or cause to be prepared and filed) with the appropriate Governmental Body all Tax Returns required to be filed by the Company with respect to any Pre-Closing Tax Period that have not been filed as of the Closing Date.

**4.2    Cooperation.**  Parent and the Unitholder Representative shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with any Tax contest and the preparation and filing of each Tax Return.  Such cooperation shall include, upon either party's request, providing

26.

records and information that are reasonably relevant to such Tax contest or Tax Return, making employees available on a mutually convenient basis to provide additional information, and explaining any materials provided. Parent and the Unitholder Representative shall not destroy or dispose of any Tax workpapers, schedules or other materials and documents supporting Tax Returns of the Acquired Companies for Pre-Closing Tax Periods until the seventh (7th) anniversary of the Closing Date, without the prior written consent of the other party, and before any disposition or destruction of such materials at any time, the party in possession of such materials will provide the other party the opportunity to take possession of such materials and documents.

**4.3    Transfer Taxes.**  All transfer, value added, excise, stock transfer, stamp, recording, registration and any similar Taxes ("**Transfer Taxes**") that become payable in connection with the Transactions shall be borne by the Unitholders.

**4.4    Audits.**  Parent shall notify the Unitholder Representative as soon as practicable after the commencement of any audit by any Governmental Body relating to the liability of any Acquired Company for Taxes for any Pre-Closing Tax Period. Parent shall control the defense of all audits and proceedings related to any Acquired Company, provided that the Unitholder Representative shall have the right to participate (but not control, provided that the Unitholder Representative shall have the right to review and approve any proposed settlement, such approval not to be unreasonably withheld), at its own expense, in any such audit or proceeding related to any Pre-Closing Tax Period of any Acquired Company that is controlled by Parent (including the right to participate in the preparation of any response to any audit inquiry) if and to the extent the result of such audit or proceeding could impose additional liability for Taxes on the Unitholders with respect to periods prior to the Closing Date. The provisions of this Section 4.1(d) shall apply in lieu of the Third Party Claims provisions of Section 6.4 to the extent of any inconsistency.

**4.5    Reporting Rules**.  To the extent permitted by applicable Legal Requirements, the parties hereto agree to report, act and file all U.S. federal income Tax Returns (and, unless otherwise required by applicable Legal Requirements, none shall take any position inconsistent therewith upon examination of any such Tax Returns, in any examination audit or other proceeding with respect to such Tax Returns) consistent with the following rules:

(a)    The transactions contemplated under this Agreement shall be treated in accordance with Situation 2 of IRS Revenue Ruling 99-6, 1999-1 C.B. 432, with Parent treated as acquiring assets of the Company (following a deemed liquidating distribution of the Company's assets to the Unitholders), and the Unitholders treated as selling their interests in the Company to Parent (and reporting gain or loss, if any, in accordance with Section 741 of the Code);

(b)    The Company (as a result of termination under Section 708(b) of the Code) shall have a Tax year that ends for U.S. federal income tax purposes as of the end of the day on the Closing Date; and

(c)    The Upfront Consideration and the Earnout Amounts payable to the Unitholders and any other relevant items or adjustments shall be allocated among the assets of the Acquired Companies in accordance with the applicable provisions of Section 1060 of the Code and the Treasury Regulations thereunder (or comparable provisions of state or local law). Parent shall prepare a proposed allocation consistent with the foregoing within 120 days of the Closing Date and provide the proposed allocation to the Unitholder Representative for review and comment. Prior to the delivery of such proposed allocation, Parent shall consult with the Unitholder Representative about such proposed allocation. Each of Parent and the Unitholder Representative shall consider in good faith any comments

made by the other of them. Parent, the Acquired Companies and the Unitholders shall report and file U.S. federal income Tax Returns consistent with the allocation as finally determined by mutual agreement among Parent and the Unitholder Representative, and none of Parent, the Acquired Companies and the Unitholders shall take any position inconsistent therewith (unless otherwise required by applicable Legal Requirement). For the avoidance of doubt, the parties acknowledge that the Unitholders may report any Earnout Amounts payable to the Unitholders under the installment method of reporting under Section 453 of the Code except with respect to any amounts treated as imputed interest pursuant to Section 483 of the Code. For the further avoidance of doubt, (i) any Reserve Payments received by a Unitholder who is or was a service provider to an Acquired Company will be treated as compensation for income and employment Tax purposes, and (ii) any amount received pursuant to this Agreement by an Earn-Out Participant other than a Unitholder will be treated as compensation for income and employment Tax purposes.

**SECTION 5.    CLOSING DELIVERABLES OF THE PARTIES**

    **5.1    Closing Deliverables of the Company and Unitholders.** At the Closing, the Company shall deliver, or cause to be delivered, the following to Parent:

        **(a)**    the Allocation Certificate;

        **(b)**    a statement (in such form as may be reasonably requested by counsel to Parent) conforming to the requirements of Section 1.1445-11T(d)(2) of the United States Treasury Regulations;

        **(c)**    good standing certificates from the Secretaries of State of the States of Illinois, as well as any other State in which the Company is qualified to do business;

        **(d)**    resignations of each of the officers, manager and member of the advisory board, effective as of the Closing;

        **(e)**    the Written Consent;

        **(f)**    all Consents required to be obtained in connection with this Agreement and the Transactions, including each of the Consents identified in <u>Part 2.20</u> of the Disclosure Schedule, which Consents shall be in full force and effect;

        **(g)**    evidence satisfactory to Parent that all sales Tax liabilities owed by the Company through the Closing Date have been paid to the appropriate Governmental Body;

        **(h)**    evidence satisfactory to Parent that the Company has received from the appropriate Governmental Body an extension to the due date for filing the Company's Tax Return for 2013;

        **(i)**    a certificate from the Company's Secretary having attached thereto (i) the Articles of Organization of the Company as in effect immediately prior to the Effective Time, (ii) the Operating Agreement of the Company as in effect immediately prior to the Effective Time, (iii) resolutions approved by the Company's Board of Managers authorizing the transactions contemplated hereby and (iv) the executed Written Consent; and

        **(j)**    a Bonus and Release Agreement in a form acceptable to Parent executed by each individual listed on <u>Schedule A</u>.

## SECTION 6.   INDEMNIFICATION, ETC.

### 6.1   Survival of Representations, Etc.

(a)      All representations and warranties of the Company set forth in this Agreement shall expire on June 30, 2017; *provided, however,* that the IP Representations shall survive until June 30, 2018, the Specified Representations (other than the IP Representations and Tax Representations) shall survive indefinitely and the Tax Representations shall survive until 60 days following the expiration of the applicable statute of limitations, including any extensions.  If, at any time on or prior to the expiration of a representation or warranty, any Indemnitee (acting in good faith) delivers to the Unitholder Representative a Notice of Indemnification Claim (as defined in Section 6.5(a)) alleging the existence of an inaccuracy in or a breach of any of such representations or warranties and asserting a claim for recovery under Section 6.2 based on such inaccuracy or breach, then the claim asserted in such Notice of Indemnification Claim shall survive until such time as such claim is fully and finally resolved.  All covenants of the Company shall survive until performed. It is the express intent of the parties hereto that, if the applicable survival period for an item as contemplated by this Section 6 is shorter than the statute of limitations that would otherwise have been applicable to such item, then, by contract, the applicable statute of limitations with respect to such item shall be reduced to the shortened survival period contemplated hereby.  The parties further acknowledge that the time periods set forth in this Section 6 for the assertion of claims under this Agreement are the result of arms'-length negotiation among the parties and that they intend for the time periods to be enforced as agreed by the parties.

(b)      The representations, warranties, covenants and obligations of the Company, and the rights and remedies that may be exercised by the Indemnitees shall not be limited or otherwise affected by or as a result of any information furnished to, or any investigation made by or knowledge of any of the Indemnitees (as the case may be).

(c)      Each Earn-Out Participant waives, and acknowledges and agrees that such Earn-Out Participant shall not have and shall not exercise or assert (or attempt to exercise or assert), any right of contribution, right of indemnity or other right or remedy against Parent or the Company in connection with any indemnification obligation or any other liability to which such Earn-Out Participant may become subject under or in connection with this Agreement.

(d)      The parties agree that any amount paid to any Indemnitee pursuant to this Section 6, other than payments in the form of an offset against the Reserve Payment, shall be treated as a reduction in the consideration received in the Transaction for federal income Tax purposes.

(e)      Except in the case of fraud, intentional misrepresentation or willful misconduct (collectively, "**Separate Matters**"), claims for indemnification, compensation and reimbursement brought in accordance with and subject to this Section 6, in addition to such matters and procedures covered by Sections 1.5 and 4.1, shall be the sole and exclusive remedy of any Indemnitee for monetary damages from and after the Closing with respect to this Agreement.  Without limiting the generality of the foregoing, nothing contained in this Agreement shall limit the rights of any Indemnitee to seek or obtain injunctive relief or any other equitable remedy to which such Indemnitee is otherwise entitled.

### 6.2   Indemnification by the Earn-Out Participants .  Subject to the terms and conditions of this Section 6 (including, without limitation, the limitations on time periods set forth in Section 6.1(a)), from and after the Closing, each Earn-Out Participant shall, jointly and not severally, hold harmless and indemnify each of the Indemnitees from and against, and shall compensate and reimburse each of the Indemnitees for, any Damages that are suffered or incurred by any of the Indemnitees or to which any of

the Indemnitees may otherwise become subject (regardless of whether or not such Damages relate to any third-party claim) and that arise from or as a result of:

     **(a)**    any inaccuracy in or breach of any representation or warranty set forth in Section 2 of this Agreement;

     **(b)**    any breach of any covenant or obligation of the Company under this Agreement;

     **(c)**    any Unitholder Matter;

     **(d)**    any inaccuracy in the Allocation Certificate;

     **(e)**    any Unpaid Transaction Expenses to the extent not accurately reflected in the Allocation Certificate;

     **(f)**    any Outstanding Payables to the extent not accurately reflected in the Allocation Certificate;

     **(g)**    All Taxes (or the non-payment thereof) of the Acquired Companies for any Pre-Closing Tax Period; or

     **(h)**    any Third-Party Claim that either constitutes, or, if determined adversely to Parent or any other Indemnitees, would provide a basis for an indemnification claim under, any of the items referenced in clauses (a) through (g) hereof.

     **6.3**    **Certain Limitations; Recovery**.

     **(a)**    Notwithstanding anything else hereto, no Indemnitee may seek recovery under Section 6.2(a) unless and until one or more Indemnification Claims seeking recovery of Damages in excess of $50,000 in the aggregate (the "**Basket**") has or have been delivered pursuant to Section 6.5 and, if such amounts are payable in accordance with this Section 6, the Indemnitee shall be entitled to recover all Damages so identified in full from the first dollar, including the amount of the Basket; *provided*, *that* the foregoing shall not apply with respect to any claim under Section 6.2(a) with respect to a breach of any Specified Representation.

     **(b)**    Except in the case of Separate Matters, recovery from the Reserve Payment and setoff against the Earnout Amounts shall be the Indemnitees' sole and exclusive remedy for monetary Damages resulting from the matters referred to in Section 6.2(a), provided, that, the foregoing shall not apply with respect to any breach of the Specified Representations.

     **(c)**    Except in the case of Separate Matters and subject to Section 6.3(a), each Unitholder's maximum liability for monetary Damages under the provisions of this Agreement shall in no circumstance exceed the aggregate proceeds paid or payable to such Unitholder pursuant to this Agreement (in addition, for the avoidance of doubt, to amounts recovered by Parent directly from the Reserve Payment or setoff against the Earnout Amounts).

     **(d)**    Parent agrees that it shall seek recovery for any indemnification claims: (A) first, by offsetting against the Reserve Payment; (B) after such time as the Reserve Payment has been paid to the Unitholders, has been exhausted or is subject to preexisting claims, to the extent permitted by the provisions of this Section 6, by offsetting against the Earnout Amounts; and (C) after such time as the

Reserve Payment and the Earnout Amounts have been paid to the Unitholders or the Earn-Out Participants, as applicable, have been exhausted or are subject to preexisting claims, to the extent permitted by the provisions of this Section 6, directly against the Earn-Out Participants.

(e)    Notwithstanding the provisions of Section 6.3 above, nothing in this Agreement shall limit the rights or remedies of any Indemnitee against any particular Earn-Out Participant, or the liability of any particular Earn-Out Participant, for a breach by such particular Earn-Out Participant of any provision of any agreement (other than this Agreement) executed and delivered by such Earn-Out Participant in connection with the Transactions.

(f)    Notwithstanding any other provision of this Agreement, no Earn-Out Participant shall be required to indemnify any Indemnitee pursuant to this Section 6 for any Damages to the extent that any Indemnitee actually receives proceeds from insurance, reimbursements, other recoveries or any amounts from third parties with respect to such Damages to pay such Damages, net of costs and expenses incurred in connection with the collection of such amounts; *provided, however*, that no Indemnitee shall be required to seek any insurance or maintain any such insurance policies or other coverage or seek any reimbursements, other recoveries or any amounts from third parties. The Indemnitee shall promptly refund any amount it actually receives (net of costs and expenses, incurred in connection with the collection of such amount) pursuant to the preceding sentence from insurance to the extent it actually receives such amount after payment by any Earn-Out Participant.

(g)    Subject to the limitations set forth in this Section 6, Parent is expressly authorized to set off any Damages for which it is entitled to indemnification from a given Earn-Out Participant (including in respect of a claim pursuant to Section 4.1) against a Unitholder's Pro Rata Percentage of the Reserve Payment and an Earn-Out Participant's Earn-Out Percentage of the Earnout Amounts, if any.  If at the time the Reserve Payment or any Earnout Amount is due and payable there shall be any outstanding indemnification claim pursuant to this Section 6 (or any claim pursuant to Section 4.1), the amount of Damages with respect to which shall not have been finally determined, then the amount of such Reserve Payment or Earnout Amount shall be reduced by the amount of Damages Parent reasonably estimates to be subject to such indemnification claim and withheld by Parent until such time as such claim has been finally resolved in accordance with this Agreement.  If the final amount of Damages for such claim is less than the amount by which the Reserve Payment or such Earnout Amount was reduced for such claim, then Parent shall promptly deliver the difference to the Unitholders or the Earn-Out Participants, as applicable.

**6.4    Defense of Third Party Claims.**    In the event of the assertion or commencement by any Person of any claim or Legal Proceeding with respect to which any Indemnitee may be entitled to be held harmless, indemnified, compensated or reimbursed pursuant to this Section 6 (a "**Third-Party Claim**"), (a) Parent shall notify the Unitholder Representative promptly after Parent receives written notice of such claim or Legal Proceeding (it being understood that any failure by Parent to so notify the Unitholder Representative shall have no effect on an Indemnitee's ability to recover Damages pursuant to this Section 6 to the extent such failure is not prejudicial), (b) Parent shall have the right, at its election, to proceed with the defense of such claim or Legal Proceeding on its own; and (c) the Unitholder Representative shall be entitled, at its expense, to participate in any defense of such claim or Legal Proceeding.  If Parent so proceeds with the defense of any such claim or Legal Proceeding:  (i) all reasonable fees and expenses relating to the defense of such claim or Legal Proceeding shall constitute Damages, subject to the limitations and other provisions in Section 6, and may, in Parent's discretion, be advanced to Parent from the Reserve Payment or set-off against Earnout Amounts otherwise payable by Parent as such fees and expenses are incurred; (ii) the Unitholder Representative and each Unitholder shall make available to Parent any documents and materials that Parent determines in good faith may be

31.

necessary to the defense of such claim or Legal Proceeding; and (iii) Parent shall have the right to settle, adjust or compromise such claim or Legal Proceeding.

      **6.5**    **Indemnification Claims.**

      **(a)**    If any Indemnitee has incurred or suffered or claims to have incurred or suffered, or believes that it may incur or suffer, Damages for which it is or may be entitled to be held harmless, indemnified, compensated or reimbursed under this Section 6 or under Section 4.1, such Indemnitee may deliver a notice to the Unitholder Representative (any such notice being referred to as a "**Notice of Indemnification Claim**," and the claim for indemnification, compensation and reimbursement described in such Notice of Indemnification Claim being referred to as an "**indemnification claim**"), which shall (i) state that such Indemnitee believes that that there is or has been an inaccuracy in or breach of a representation, warranty, covenant or obligation contained in this Agreement or that such Indemnitee is otherwise entitled to be held harmless, indemnified, compensated or reimbursed under this Section 6, (ii) contain a description of the circumstances supporting such Indemnitee's belief that there is or has been such an inaccuracy or breach or that such Indemnitee may otherwise be entitled to be held harmless, indemnified, compensated or reimbursed and (iii) contain a good faith, non-binding, preliminary estimate of the aggregate dollar amount of Damages that have arisen or reasonably may arise as a result of the inaccuracy, breach or other matter referred to in such notice (the aggregate amount of such estimate, as it may be modified by such Indemnitee in good faith from time to time, being referred to as the "**Claimed Amount**").

      **(b)**    During the 30-day period commencing upon the delivery by an Indemnitee to the Unitholder Representative of a Notice of Indemnification Claim (the "**Dispute Period**"), the Indemnifying Party shall deliver to the Indemnitee a written response (the "**Response Notice**") in which the Indemnifying Party:  (i) agrees that the full Claimed Amount is owed to the Indemnitee; (ii) agrees that part (but not all) of the Claimed Amount is owed to the Indemnitee; or (iii) asserts that no part of the Claimed Amount is owed to the Indemnitee.  Any part of the Claimed Amount that is not agreed by the Indemnifying Party to be owed to the Indemnitee pursuant to the Response Notice (or the entire Claimed Amount, if the Indemnifying Party asserts in the Response Notice that no part of the Claimed Amount is owed to the Indemnitee) shall be referred to as the "**Contested Amount**" (it being understood that the Contested Amount shall be modified from time to time to reflect any good faith and reasonable modifications by the Indemnitee to the Claimed Amount).  If a Response Notice is not sent to the Indemnitee prior to the expiration of the Dispute Period, then the Unitholder Representative shall be conclusively and irrevocably deemed to have agreed that the full Claimed Amount is owed to the Indemnitee.  If there is a Contested Amount, the Unitholder Representative and the Indemnitee shall attempt in good faith to resolve the dispute related to the Contested Amount.  If the Indemnitee and the Unitholder Representative resolve such dispute in writing, then their resolution of such dispute shall be binding on the Unitholder Representative, the Earn-Out Participants, Parent and the other Indemnitees and a settlement agreement stipulating the amount owed to the Indemnitee (the "**Stipulated Amount**") shall be signed by the Indemnitee and the Unitholder Representative.

      **(c)**    If the Unitholder Representative and the Indemnitee are unable to resolve the dispute relating to any Contested Amount during the 30-day period commencing upon the delivery of the Response Notice, then either the Indemnitee or the Unitholder Representative may submit the contested portion of the indemnification claim to the California Courts in accordance with Section 7.7.

**SECTION 7.**    **MISCELLANEOUS PROVISIONS**

      **7.1**    **Unitholder Representative.**

(a)     Each Earn-Out Participant hereby irrevocably nominates, constitutes and appoints Richard Komaiko as the agent and true and lawful attorney-in-fact of the Earn-Out Participants, with full power of substitution, to act in the name, place and stead of the Earn-Out Participants for purposes of executing any documents and taking any actions that the Unitholder Representative may, in its sole discretion, determine to be necessary, desirable or appropriate in all matters relating to or arising out of this Agreement, including in connection with any payment pursuant to Sections 1.2, 1.4 or claims for indemnification under Section 6.  Richard Komaiko hereby accepts its appointment as the Unitholder Representative.

(b)     Each of the Earn-Out Participants grants to the Unitholder Representative full authority to execute, deliver, acknowledge, certify and file on behalf of the Earn-Out Participants (in the name of any or all of the Earn-Out Participants or otherwise) any and all documents that the Unitholder Representative may, in its sole discretion, determine to be necessary, desirable or appropriate, in such forms and containing such provisions as the Unitholder Representative may, in its sole discretion, determine to be appropriate, in performing its duties as contemplated by Section 7.1(a).  Notwithstanding anything to the contrary contained in this Agreement or in any other Contract executed in connection with the Transactions, each Indemnitee shall be entitled to deal exclusively with the Unitholder Representative on all matters relating to Sections 1.2, 1.4, and 6 and shall be entitled to rely conclusively (without further evidence of any kind whatsoever) on any document executed or purported to be executed on behalf of any Earn-Out Participants by the Unitholder Representative and on any other action taken or purported to be taken on behalf of any Earn-Out Participant by the Unitholder Representative, as fully binding upon such Earn-Out Participant.

(c)     The power of attorney granted in Section 7.1(a):  (i) is coupled with an interest and is irrevocable; (ii) may be delegated by the Unitholder Representative; and (iii) shall survive the dissolution, death or incapacity of each of the Earn-Out Participants.

(d)     If the Unitholder Representative shall be unable to fulfill its responsibilities as agent of the Earn-Out Participants, then a majority in interest of the Earn-Out Participants (determined based in accordance with their respective Earn-Out Percentages) shall, within 10 days after such event, appoint a successor agent for the Earn-Out Participants and, promptly thereafter, shall notify Parent of the identity of such successor.  Any such successor shall become the "Unitholder Representative" for purposes of this Agreement.

(e)     The Unitholder Representative shall not be liable to any Earn-Out Participant for any act done or omitted hereunder as the Unitholder Representative while acting in good faith (and any act done or omitted pursuant to the advice of counsel shall be conclusive evidence of such good faith) and without gross negligence or willful misconduct.  All losses, liabilities and expenses incurred by the Unitholder Representative in connection with the performance of his duties as Unitholder Representative shall be borne and paid exclusively by the Earn-Out Participants.

**7.2     Fees and Expenses.**  Except as otherwise provided in this Agreement, each party to this Agreement shall bear and pay all fees, costs and expenses (including legal fees, accounting fees and investment banking fees) that have been incurred or that are incurred by or on behalf of such party in connection with the Transactions.

**7.3     Attorneys' Fees.**  If any Legal Proceeding relating to this Agreement or the enforcement of any provision of this Agreement is brought against any party hereto, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing party may be entitled).

**7.4** **Notices.**  Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by hand, by registered mail, by courier or express delivery service or by facsimile) to the address or facsimile telephone number set forth beneath the name of such party below (or to such other address or facsimile telephone number as such party shall have specified in a written notice given to the other parties hereto):

> **if to Parent:**
>
> LegalZoom.com, Inc.
> 101 N. Brand Blvd., 11th Floor
> Glendale, California 91203
> Attention: Legal Department
> Email: legal@legalzoom.com
>
> with a copy to:
>
> Cooley LLP
> 1333 2[nd] Street, Suite 400
> Santa Monica, California 90401
> Attention:  C. Thomas Hopkins, Esq.
> Facsimile:  (310) 883-6500
> Email:  thopkins@cooley.com
>
> **if to the Unitholder Representative:**
>
>
>
> **if to any of the Earn-Out Participants:**
>
> to such address and facsimile number set forth on the Allocation Certificate

**7.5** **Headings.**  The headings contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

**7.6** **Counterparts and Exchanges by Electronic Transmission.**  This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.  The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission shall be sufficient to bind the parties to the terms and conditions of this Agreement.

**7.7** **Governing Law; Venue.**

(a)    This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of California (without giving effect to principles of conflicts of laws).

**(b)**     Any Legal Proceeding relating to this Agreement or the enforcement of any provision of this Agreement may be brought or otherwise commenced only in any state or federal court located in the State of California in the county of Los Angeles (the "**California Courts**"). Each party to this Agreement: (i) irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the California Courts; (ii) agrees that each of the California Courts shall be deemed to be a convenient forum; and (iii) agrees not to assert (by way of motion, as a defense or otherwise), in any such Legal Proceeding commenced in any California Court, any claim that such party is not subject personally to the jurisdiction of such court, that such Legal Proceeding has been brought in an inconvenient forum, that the venue of such Legal Proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

**7.8     Successors and Assigns.**     This Agreement shall be binding upon:  the Acquired Companies and their successors and assigns (if any); each of the Earn-Out Participants and their respective personal representatives, executors, administrators, estates, heirs, successors and assigns (if any); Parent and its successors and assigns (if any); and the Unitholder Representative and its personal representatives, executors, administrators, estates, heirs, successors and assigns (if any).  This Agreement shall inure to the benefit of:  the Acquired Companies; Parent; the Earn-Out Participants; the other Indemnitees; the Unitholder Representative; and the respective successors and assigns (if any) of the foregoing.  Parent may freely assign any or all of its rights and obligations under this Agreement (including its indemnification rights under Section 6), in whole or in part, to any other Person without obtaining the consent or approval of any other party hereto; *provided, that*, such Person agrees in writing to be bound by the provisions of this Agreement.  Neither the Company nor any Earn-Out Participants may assign its rights and obligations under this Agreement without obtaining the written consent of Parent.

**7.9     Specific Performance.**     The parties to this Agreement agree that, in the event of any breach or threatened breach by any party to this Agreement of any covenant, obligation or other provision set forth in this Agreement for the benefit of any other party to this Agreement, such other party shall be entitled (in addition to any other remedy that may be available to it) to (a) a decree or order of specific performance or mandamus to enforce the observance and performance of such covenant, obligation or other provision and (b) an injunction restraining such breach or threatened breach.  The parties agree that no party shall be required to provide any bond or other security in connection with any such decree, order or injunction or in connection with any related Legal Proceeding.

**7.10     Waiver**.

**(a)**     No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

**(b)**     No Person shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Person; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

**7.11    Waiver of Jury Trial.  Each of the parties hereto hereby irrevocably waives any and all right to trial by jury in any Legal Proceeding arising out of or related to this Agreement or the transactions contemplated hereby.**

7.12    **Amendments.**  This Agreement may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of Parent and the Unitholder Representative, unless such amendment, modification, alteration or supplement increases the representations, warranties or covenants of one or more Earn-Out Participants, in which such shall amendment shall require the consent of any such affected Earn-Out Participant.

7.13    **Severability.**  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties hereto agree that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.  In the event such court does not exercise the power granted to it in the prior sentence, the parties hereto agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

7.14    **Parties in Interest.**  Except for the provisions of 7, none of the provisions of this Agreement is intended to provide any rights or remedies to any Person other than the parties hereto and their respective successors and assigns (if any).

7.15    **Entire Agreement.**  This Agreement and the other agreements referred to herein set forth the entire understanding of the parties hereto relating to the subject matter hereof and thereof and supersede all prior agreements and understandings among or between any of the parties relating to the subject matter hereof and thereof.

7.16    **Construction.**

(a)    For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

(b)    The parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

(c)    As used in this Agreement and the Exhibits to this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(d)    The phrase "delivered to Parent" or similar phrases used in this Agreement shall mean that true and correct copies of the subject document were posted to the electronic data room for this transaction at least five (5) business days prior to the Closing.

**(e)**     Except as otherwise indicated, all references in this Agreement to "Sections," "Exhibits" and "Schedules" are intended to refer to Sections of this Agreement and Exhibits and Schedules to this Agreement.

*[Remainder of page intentionally left blank]*

DocuSign Envelope ID: 86374C4C-A68C-419C-99A5-49522753755DA

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

**LEGALZOOM.COM, INC.,**
  a Delaware corporation

By _____
  John Suk, Chief Executive Officer


**LZ LOCAL, LLC,**
  an Illinois limited liability company

**By:**    **LegalZoom.com, Inc., its sole member**

By _____
  John Suk, Chief Executive Officer


**AMICUS MEDIA LLC,**
  an Illinois limited liability company

By: _____
  Richard Komaiko, CEO


**RICHARD KOMAIKO,**
as Unitholder Representative

By: _____


**RICHARD KOMAIKO**

_____


**BEIBEI QUE**

_____


**BRYAN HARRIS**

_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

LEGALZOOM.COM, INC.,
  a Delaware corporation

By: _____
    Frank Monestere, President


LZ LOCAL, LLC,
  an Illinois limited liability company

By:      LegalZoom.com, Inc., its sole member


By: _____
    Frank Monestere, President


AMICUS MEDIA LLC,
  an Illinois limited liability company
    *Richard Komaiko*
By: _____
    Richard Komaiko, CEO


RICHARD KOMAIKO,
as Unitholder Representative
    *Richard Komaiko*
By: _____


RICHARD KOMAIKO
    *Richard Komaiko*
_____


BEIBEI QUE

_____


BRYAN HARRIS
    *Bryan Harris*
_____

In Witness Whereof, the parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

LegalZoom.com, Inc.,
  a Delaware corporation

By: _____
    Frank Monestere, President


LZ Local, LLC,
  an Illinois limited liability company

By:     LegalZoom.com, Inc., its sole member


By: _____
    Frank Monestere, President


Amicus Media LLC,
  an Illinois limited liability company

By: _____
    Richard Komaiko, CEO


Richard Komaiko,
as Unitholder Representative

By: _____


Richard Komaiko

_____


Beibei Que
*Beibei Que*
_____


Bryan Harris

_____


Agreement and Plan of Merger Signature Page

**EXHIBIT A**

**CERTAIN DEFINITIONS**

For purposes of the Agreement (including this Exhibit A and the Disclosure Schedule):

**Acquired Companies.** "Acquired Companies" shall mean the Company and each of its Subsidiaries.

**Affiliate.** "Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

**Agreement.** "Agreement" shall mean the Agreement and Plan of Merger to which this Exhibit A is attached (including the Disclosure Schedule), as it may be amended from time to time.

**Allocation Certificate.** "Allocation Certificate" shall mean a certificate of the Company, signed by the Chief Executive Officer of the Company, certifying as to the accuracy and completeness, in each case as of immediately prior to the Closing, of the following: (i) the outstanding payables of the Company and the name, contact information, wire instructions and payoff amounts, including all interest, premiums and penalties, necessary to satisfy in full and terminate such outstanding payables (the "**Outstanding Payables**"); (ii) the Unpaid Transaction Expenses and the name, contact information, wire instructions and payoff amounts, including all interest, premiums and penalties, necessary to satisfy in full and terminate such Unpaid Transaction Expenses; (iii) the name, address taxpayer identification number of each Earn-Out Participant, as well as wiring instructions; (iv) the aggregate number of Units held by each Unitholder as of immediately prior to the Closing; (v) the Per Unit Closing Amount and Upfront Consideration; (vi) the amount of Upfront Consideration payable at Closing to each Unitholder; (viii) each Unitholder's allocation of the Reserve Payment (expressed in dollars), (ix) the Pro Rata Percentage of each Unitholder and (x) the Earn-Out Percentage of each Earn-Out Participant.

**Business**. "Business" means the business of the Acquired Companies as presently conducted and as presently proposed to be conducted.

**Cause**. "Cause" shall mean the occurrence of any one or more of the following: (i) a good faith determination of Parent that a Specified Employee willfully and repeatedly failed to follow the lawful written directions of the Board of Managers of the Surviving Company or the Board of Directors of Parent; provided, that no termination for Cause shall occur unless a Specified Employee has been provided with notice of Parent's intention to terminate him for Cause and has had at least thirty (30) days to cure or correct his behavior, if cure is feasible, except that no such notice need be furnished for any subsequent such conduct after the initial conduct is remedied; (ii) engagement in gross misconduct which is materially detrimental to the Surviving Entity or any other Parent Entity; (iii) material violation or willful and repeated failure or refusal to comply in any material respect with this Agreement, such Specified Employee's employment agreement or offer letter, as applicable, or any reasonable policy of the Surviving Entity or Parent or any statutory duty where noncompliance would be materially detrimental to the Surviving Entity or the Parent; (iv) (A) the commission or attempted commission of an unlawful or criminal act (serious in nature) or (B) the commission or attempted commission of a fraud, or act of dishonesty or moral turpitude which the Board of Managers of the Company or the Board of Directors of Parent reasonably believes would reflect adversely on the Surviving Entity or Parent.

(i) the commission of any crime involving fraud, dishonesty or moral turpitude; (ii) the attempted commission of or participation in a fraud or act of dishonesty against a Parent Entity; (iii) the material violation of any contract or agreement between such individual and a Parent Entity or any statutory duty such individual owes to a Parent Entity; or (iv) conduct that constitutes gross insubordination, incompetence or habitual neglect of duties and that is not remedied within a reasonable period of time (not to exceed thirty (30) days) after written notice has been provided to such individual from a Parent Entity of such conduct, provided that no such notice need be provided for any subsequent such conduct after the initial conduct is remedied.

**COBRA.** "COBRA" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

**Code.** "Code" shall mean the Internal Revenue Code of 1986, as amended.

**Company Contract.** "Company Contract" shall mean any Contract:  (a) to which any Acquired Company is a party; (b) by which any Acquired Company or any of its assets is bound or under which any Acquired Company has any obligation; or (c) under which any Acquired Company has any right or interest.

**Company Data**.  "Company Data" means all right, title and interest in and to the data contained in any databases of the Acquired Companies (including any User Data, trade secrets and Personal Data) and all other information and data compilations owned by or licensed to any Acquired Company that are used in, necessary for the conduct of, or related to, the Business.

**Company Employee.**  "Company Employee" shall mean any current or former employee, consultant or independent contractor of any Acquired Company.

**Company Employee Agreement.**  "Company Employee Agreement" shall mean any management, employment, severance, change in control, transaction bonus, consulting, relocation, repatriation or expatriation agreement or other Contract between any Acquired Company and any Company Employee, other than any such Contract that is terminable "at will" and without any obligation on the part of any Acquired Company to make any payments or provide any benefits in connection with termination of such Contract.

**Company Employee Plan.**  "Company Employee Plan" shall mean any plan, program, policy, practice, Contract or other arrangement providing for compensation, severance, termination pay, deferred compensation, performance awards, stock or stock-related awards, fringe benefits or other employee benefits or remuneration of any kind, whether written, unwritten or otherwise, and whether funded or unfunded, including each "employee benefit plan," within the meaning of Section 3(3) of ERISA (whether or not ERISA is applicable to such plan), that is or has been maintained, contributed to or required to be contributed to by any Acquired Company for the benefit of any Company Employee, or with respect to which any Acquired Company has or may have any liability or obligation; *provided, however,* than a Company Employee Agreement shall not be considered an "Company Employee Plan."

**Company IP.**  "Company IP" shall mean: (a) all Intellectual Property and Intellectual Property Rights in the Company Products or Services; and (b) all other Intellectual Property and Intellectual Property Rights, in each case, that are owned by or licensed to any Acquired Company and are or were used in, necessary for the conduct of, or related to, the Business, together with the goodwill associated with the Business.

**Company Pension Plan.** "Company Pension Plan" shall mean any (a) Company Employee Plan that is an "employee pension benefit plan," within the meaning of Section 3(2) of ERISA, or (b) other occupational pension plan, including any final salary or money purchase plan.

**Company Privacy Policy.** "Company Privacy Policy" shall mean each external, publicly available privacy policy of any Acquired Company, or of any white labeled website of a Company customer ("**Company Customer**") from which Company Customer offers the Company Products or Services to Company Customers (each, a "**Company Customer Website**") including any policy relating to: (a) the privacy of users of any Company Website; and (b) the collection, storage, disclosure, and transfer of any User Data or Personal Data; and (c) any employee information.

**Company Source Code.** "Company Source Code" means all Source Code that is owned by or licensed to any of the Acquired Companies and that is part of, distributed with, or used in the operation of any Company Product or Service.

**Consent.** "Consent" shall mean any approval, consent, ratification, permission, waiver or authorization (including any Governmental Authorization).

**Contract.** "Contract" shall mean any written, oral or other agreement, contract, subcontract, lease, understanding, instrument, note, certificate, warranty, proxy, insurance policy, benefit plan or legally binding commitment, arrangement or undertaking of any nature.

**Damages.** "Damages" shall include claims, liabilities, damages, Taxes, diminution of value, lost profits, payments, obligations, losses, costs and expenses (including costs of investigation and defense and reasonable fees and expenses of lawyers, experts and other professionals), and judgments (at law or in equity) of any nature, whether or not due to an action by a third party. Notwithstanding the foregoing, Damages shall not be reduced by any income Tax benefit received or receivable by Parent with respect to any payments otherwise constituting Damages for the purposes of the preceding sentences.

**DOL.** "DOL" shall mean the United States Department of Labor.

**Earn-Out Participant.** "Earn-Out Participant" shall mean each Unitholder and each individual set forth Schedule A.

**Earn-Out Percentage.** "Earn-Out Percentage" shall mean the percentage of the payments payable pursuant to Section 1.5(b) applicable to each Earn-Out Participant, as set forth on the Allocation Certificate.

**Encumbrance.** "Encumbrance" shall mean any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, claim, infringement, interference, option, right of first refusal, preemptive right, community property interest or restriction of any nature (including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset and any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset).

**Entity.** "Entity" shall mean any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

**Environmental Law.** "Environmental Law" shall mean any applicable federal, state, local or foreign Legal Requirement relating to pollution or protection of worker health or safety (with respect to

exposure to Materials of Environmental Concern) or the environment (including ambient air, surface water, ground water, land surface or subsurface strata), including any Legal Requirement relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Materials of Environmental Concern.

**ERISA**.  "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

**FMLA.**  "FMLA" shall mean the Family Medical Leave Act of 1993, as amended.

**Fully Diluted Units**.  "Fully Diluted Units" shall mean, immediately prior to the Effective Time, the aggregate number of Units issued and outstanding.

**GAAP.**  "GAAP" shall mean generally accepted accounting principles in the United States.

**Good Reason.**  "Good Reason" shall mean the applicable Specified Employee's resignation following expiration of any cure period (discussed below) following the occurrence, without such Specified Employee's express written consent, of any of the following: (i) a material reduction in such Specified Employee's base salary (other than as a result of a compensation reduction applicable to similarly-situated employees); or (ii) a material change in the geographic location at which a Specified Employee must perform his or her assigned duties; *provided, that*, a permanent relocation of less than fifty (50) miles from such Specified Employee's then present location will not be considered a material change in geographic location; *provided, further*, that if Parent closes its offices in Mountain View, California, a permanent relocation to either Parent's Glendale, California or Austin, Texas offices will not be considered a material change in geographic location, it being understood that, as between the Glendale and Austin offices, the Specified Employee shall be entitled to elect the office.  A Specified Employee will not resign for Good Reason without first providing Parent with written notice of the acts or omissions constituting the grounds for "Good Reason" within ninety (90) days of the initial existence of the grounds for "Good Reason" and a reasonable cure period of not less than thirty (30) days following the date of such notice.  A Specified Employee must submit a written resignation notice to Parent within sixty (60) days following the expiration of such cure period in order for such resignation to be for "Good Reason."

**Governmental Authorization.**  "Governmental Authorization" shall mean any:  (a) permit, license, certificate, franchise, permission, clearance, registration, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement; or (b) right under any Contract with any Governmental Body.

**Governmental Body.**  "Governmental Body" shall mean any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Entity and any court or other tribunal); or (d) self-regulatory organization (including the NASD).

**HIPAA.**  "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as amended.

**Indemnitees.**  "Indemnitees" shall mean (a) Parent; (b) Parent's current and future Affiliates (including the Acquired Companies); (c) the respective Representatives of the Persons referred to in clauses "(a)" and "(b)" above; and (d) the respective successors and assigns of the Persons referred to in

clauses "(a)", "(b)" and "(c)" above; *provided, however*, that the Earn-Out Participants shall not be deemed to be "Indemnitees."

**Independent Auditors**.  "Independent Auditors" shall mean an independent accounting firm mutually acceptable to Parent and the Unitholder Representative.

**Intellectual Property.**  "Intellectual Property" shall mean algorithms, application programming interfaces, apparatus, databases, data collections, diagrams, formulae, ideas, inventions (whether or not patentable), know-how, logos, marks (including brand names, product names, logos, and slogans), methods, processes, proprietary information, protocols, schematics, specifications, software, software code (in any form, including Source Code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship (whether or not copyrightable) and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries).

**Intellectual Property Rights.**  "Intellectual Property Rights" shall mean all rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights, copyrights and moral rights; (b) trademark and trade name rights and similar rights; (c) trade secret rights; (d) patent and industrial property rights; (e) other proprietary rights in Intellectual Property; and (f) rights in or relating to registrations, renewals, extensions, combinations, divisions, continuations, continuations in part, reexaminations, continued prosecution applications, requests for continued examination, and reissues of, and applications for, any of the rights referred to in clauses "(a)" through "(e)" above.

**Interim Balance Sheet Date.**  "Interim Balance Sheet Date" shall mean June 30, 2014.

**IP Representations.**  "IP Representations" shall mean the representations and warranties set forth in Section 2.9.

**IRS.**  "IRS" shall mean the United States Internal Revenue Service.

**Knowledge.**  Knowledge" shall mean, with respect to the Company, (i) the actual knowledge of the officers, managers and employees of the Company and (ii) such knowledge that such Persons should reasonably be expected to have after conducting a due and diligent inquiry of all relevant employees, consultants and advisors of the Company and its Subsidiaries who such individuals should reasonably believe would have actual knowledge of the matters represented

**Legal Proceeding.**  "Legal Proceeding" shall mean any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Body or any arbitrator or arbitration panel.

**Legal Requirement.**  "Legal Requirement" shall mean any federal, state, local, municipal, foreign or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, order, award, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

**Material Adverse Effect.**  "Material Adverse Effect" shall mean any change, event, effect, claim, circumstance or matter that (considered together with all other changes, events, effects, claims, circumstances or matters) is, or could reasonably be expected to be, materially adverse to the business, condition, assets, capitalization, liabilities, results of operations or financial performance of the Acquired

Companies; provided, however, a change resulting from any of the following shall not be deemed in and of themselves, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect: (i) any adverse effect to the extent attributable to the announcement or pendency of the Transactions; (ii) any adverse effect that results from changes affecting the industries in which the Company participates (to the extent that such changes do not disproportionately adversely affect the Company as a whole compared to other firms in the industries in which the Company participates); or (iii) the failure of the Company to meet any financial forecast, projection, estimate, prediction or models, whether internal to the Company or otherwise.

**Materials of Environmental Concern.**   "Materials of Environmental Concern" include chemicals, pollutants, contaminants, wastes, toxic substances, petroleum and petroleum products and any other substance that is now regulated by any Environmental Law.

**Open Source Code.**  "Open Source Code" Open Source Code" shall mean (a) any software that is subject to the GNU General Public License, the Affero General Public License, the GNU Lesser General Public License, the Eclipse Public License, the Common Public License, the Mozilla Public License, or (b) any other public source code license identified as an open source license by the Open Source Initiative, that requires, as a condition of the use, modification or distribution of software subject to such license or agreement, that such software or other software combined or distributed with such software be (1) disclosed, distributed, made available, offered, licensed or delivered in source code form, (2) licensed for the purpose of making derivative works, (3) licensed under terms that allow reverse engineering, reverse assembly, or disassembly of any kind, or (4) redistributable at no charge (each, an "Open Source License").

**Order.**  "Order" shall mean any order, writ, injunction, judgment or decree.

**Parent Entities.**  "Parent Entities" shall mean Parent, any its Affiliates, parent entities and Subsidiaries, including the Acquired Companies.

**Per Unit Closing Amount**.  "Per Unit Closing Amount" shall mean an amount equal to (a) the Upfront Consideration divided by (b) the Fully Diluted Units.

**Permitted Encumbrances.**  "Permitted Encumbrances" shall mean:  (a) liens for Taxes that are not yet due and payable or being litigated in good faith and for which appropriate reserves have been established; (b) liens imposed by law and incurred in the ordinary course of business for obligations not yet due and payable; and (c) liens in respect of pledges or deposits under workers' compensation laws or similar legislation.

**Person.**  "Person" shall mean any individual, Entity or Governmental Body.

**Personal Data.**  "Personal Data" shall mean a natural person's name, street address, telephone number, e-mail address, photograph, social security number or tax identification number, driver's license number, passport number, credit card number, bank information, or customer or account number, or any other piece of information that allows the identification of a natural person.

**Pre-Closing Tax Period.**  "Pre-Closing Tax Period" shall mean any taxable year or period that ends on or before the Closing Date and, with respect to any taxable year or period beginning before and ending after the Closing Date, the portion of such taxable year or period ending on and including the Closing Date.  For purposes of this Agreement, in the case of any taxable year or period of the Acquired Companies which includes the Closing Date (but does not end on that day), (a) property Taxes or other Taxes imposed on a periodic basis allocable to the Pre-Closing Tax Period shall be equal to the amount of

such property Taxes for the entire taxable year or period multiplied by a fraction, the numerator of which is the number of days during the taxable year or period that are in the Pre-Closing Tax Period and the denominator of which is the number of days in the entire taxable year or period, and (b) Taxes (other than property Taxes or other Taxes imposed on a periodic basis) of the Company for the Pre-Closing Tax Period shall be computed as if such taxable year or period (and the taxable year or period of any entity taxable as a partnership in which the Company owns a direct or indirect interest) ended as of the close of business on the Closing Date.

**Privacy Legal Requirement.** "Privacy Legal Requirement" means a Legal Requirement that pertains to privacy or restrictions or obligations related to the processing of Personal Data and exists in any country in which any Acquired Company collects, uses, processes or discloses Personal Data on behalf of itself or any Company Customer; any Person to which any Acquired Company or any Company Customer discloses or provides access to Personal Data resides or any individual whose Personal Data has been collected by any Acquired Company resides.

**Pro Rata Percentage.** "Pro Rata Percentage" shall mean, with respect to each Unitholder, a fraction, (a) the numerator of which is the aggregate number of Units held by such Unitholder as of immediately prior to the Effective Time; and (b) the denominator of which is the Fully Diluted Units.

**Registered IP.** "Registered IP" shall mean all Intellectual Property Rights that are registered, filed or issued under the authority of, with or by any Governmental Body, including all patents, registered copyrights, and registered trademarks and all applications for any of the foregoing.

**Representatives.** "Representatives" shall mean officers, directors, employees, partners, agents, attorneys, accountants, advisors and representatives.

**Reserve Payment**. "Reserve Payment" shall mean $2,000,000 plus interest accrued on such amount from the Closing Date through the Reserve Payment Date at a rate calculated based on the six (6) month LIBOR rate published by The Wall Street Journal. **Source Code.** "Source Code" shall mean code in any programming language in a form intelligible to trained programmers, including all comments and procedural code as well as all related development documents.

**Specified Employees**. "Specified Employees" shall mean Richard Komaiko and Beibei Que.

**Specified Representations.** "Specified Representations" shall mean the representations and warranties set forth in Section 2.1 (Due Organization, Subsidiaries), Section 2.3 (Capitalization), Section 2.9 (Intellectual Property), Section 2.13 (Tax Matters) and Section 2.19 (Authority, Binding Nature of Agreement).

**Subsidiary**. An Entity shall be deemed to be a "Subsidiary" of another Person if such Person directly or indirectly owns or purports to own, beneficially or of record, (a) an amount of voting securities of other interests in such Entity that is sufficient to enable such Person to elect at least a majority of the members of such Entity's board of directors or other governing body, or (b) a majority of the outstanding equity or financial interests of such Entity.

**Tax.** "Tax" or, collectively, "Taxes" means any and all federal, state, local and foreign taxes, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts, (ii) any liability for the payment of any amounts of the type described in clause (i) above as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, and (iii) any

liability for the payment of any amounts of the type described in clauses (i) or (ii) above as a result of being a successor of a predecessor entity or otherwise by operation of any Legal Requirement.

**Tax Representations.**  "Tax Representations" shall mean the representations and warranties set forth in Section 2.13.

**Tax Return.**  "Tax Return" shall mean any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information, and any amendment to any of the foregoing, filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement relating to any Tax.

**Tax Return Preparation Amount.**  "Tax Return Preparation Amount shall mean $25,000, as the agreed contribution of the Unitholders for the costs and expenses (other than any Taxes incurred) to be incurred by Parent in preparing Tax Returns for Pre-closing Tax Periods pursuant to Section 4.1(a)

**Transactions.**  "Transactions" shall mean the transactions contemplated by the Agreement.

**Unit**. "Unit" shall mean a membership interest of the Company.

**Unitholder Matter.**  "Unitholder Matter" shall mean (a) any failure of any Unitholder to have good, valid and marketable title, free and clear of all Encumbrances, to the Units, issued in the name of such Unitholder and issued and outstanding immediately prior to the Closing; or (b) any claim by a Unitholder or former Unitholder or equityholder, or by any other Person, seeking to assert, or based upon: (i) ownership or rights to ownership of any Units; (ii) any right of a Unitholder in their capacity as such, including any option, preemptive right or right to notice or to vote; (iii) if and to the extent not otherwise covered by the Company's insurance policies with respect to directors' and officers' liability, any right under the Company operating agreement or bylaws or under any indemnification agreement between such Person and the Company in effect as of the date of this Agreement; (iv) any claim that such Person's Units or Company Options were wrongfully repurchased by the Company; or (v) the allocation of any consideration to be received pursuant to this Agreement.

**Unpaid Transaction Expenses.**  "Unpaid Transaction Expenses" shall mean any third-party fee, cost, expense, payment, liability (contingent or otherwise) or obligation of any Acquired Company (including legal fees and expenses, accounting fees and expenses and financial advisory fees and expenses, but excluding Taxes) that relate to the negotiation and effectuation of this Agreement and the Transactions and that are unpaid as of the Closing.  In addition, Unpaid Transaction Expenses shall include $517,000, which is the amount payable by the Company pursuant to that certain letter agreement with Stephen Koder, dated as of July 28, 2014.

**Upfront Consideration**.  "Upfront Consideration" shall mean (a) $3,000,000 *minus* (b) the aggregate amount of the Outstanding Payables *minus* (c) the aggregate amount of the Unpaid Transaction Expenses *minus* (d) the Tax Return Preparation Amount.

**User Data**.  "User Data" shall mean any Personal Data or other data or information collected by or on behalf of any Acquired Company from users of the Company Product or Service or of any Company Website.

**EXHIBIT B**

**LETTER OF TRANSMITTAL**

SCHEDULE 1.4(B)

ADJUSTED EBITDA GUIDELINES

Earnings before interest, taxes, depreciation and amortization (Adjusted EBITDA) shall be determined in accordance with GAAP and the following guidelines.  In all cases, Adjusted EBITDA shall be calculated less all capital expenditures and shall include earnings associated with Lead Generation Offers, practice management services, and other mutually agreed products and services.  In the event of a conflict between GAAP and any of the following guidelines, the following guidelines shall control.  The Unitholder Representative and the Earn-Out Participants agree that Parent shall have sole and absolute discretion as to the decision of the appropriate method of revenue recognition to be used in determining GAAP revenue for LZL.  If the LZL Adjusted EBITDA is less than zero dollars ($0), LZL Adjusted EBITDA shall be deemed to be zero dollars ($0) for such period.   Parent will allocate all direct operating costs, losses an expenses attributable to LZL in a manner consistent with Parent's ordinary accounting methods applicable to all Parent divisions, including fulfillment, marketing, technology, general and administrative, and overhead expenses.

1. Terminated Products and Services:
   a. For all purposes hereunder (i) in the event that Parent or any of its Subsidiaries elects to terminate the offering of a product or service through LZL due to a business or legal risk, without the Unitholder Representative's consent, no Adjusted EBITDA attributable to such terminated product or service shall be included in the calculation of Adjusted EBITDA; and (ii) in the event that Parent or any of its Subsidiaries elects to terminate the offering of a product or service through LZL for a reason other than business or legal risk, without the Unitholder Representative's consent, and such terminated product or service is subsequently offered directly by Parent or any of its Subsidiaries (other than the Surviving Company), the calculation of Adjusted EBITDA for all periods following such termination shall include the greater of (A) the annualized average Adjusted EBITDA attributable to such product or service for the 6 months prior to such termination and (B) the Adjusted EBITDA that is actually earned by Parent or any of its Subsidiaries for such period attributable to such product or service.
   b. If the Unitholder Representative consents in writing to the termination of a product or service, the previous sentence shall not apply and no Adjusted EBITDA attributable to such terminated product or service shall be included in the calculation of Adjusted EBITDA.

2. Alternative Business Structures:  In the event that Parent or any of its Subsidiaries establishes an Alternative Business Structure or a similar entity that is owned by Parent or any of its Subsidiaries, that provides legal services to clients located in the United States (a "**Qualifying ABS**"), any determination of Adjusted EBITDA pursuant to this Agreement shall include the greater of (a) 33% of the earnings before interest, taxes, depreciation and amortization less capital expenditures for products offered by LZL attributable to such Qualifying ABS and (b) the amount of Adjusted EBITDA LZL would have earned through its lead generation model based on the average of the 6 months prior to such date of determination that is lost to the Qualifying ABS in the reasonable determination of Parent and the Unitholder Representative.  For the avoidance of doubt, the earnings before interest, taxes, depreciation and amortization less capital expenditures attributable to a Qualifying ABS shall not include any earnings before interest, taxes, depreciation and amortization less capital expenditures related to services provided in connection with business or trademark litigation or any other products that would not otherwise have been the subject of lead generation through LZL.

3.  Parent Employees:  For each employee or consultant of Parent or any of its Subsidiaries who spends any of his or her work hours on LZL's business, the compensation and other expenses of such employee or consultant shall only be included in the calculation of Adjusted EBITDA under this Agreement if, and to the extent, mutually agreed by the general manager of LZL and the chief executive officer of Parent in writing; *provided, that*, the compensation and expenses of one marketing employee dedicated to search engine marketing and a one finance employee dedicated to maintaining LZL's books and records shall be included in the calculation of EBIDTA, which employees shall be mutually approved and processed through the Parent's customary screening process.

4.  Search Engine Marketing Costs:   For all purposes hereunder, the calculation of Adjusted EBITDA shall include the costs of search engine marketing incurred by Parent or any of its Subsidiaries (including the Acquired Companies) in connection with the products and services offered by LZL.  If the actual costs of search engine marketing are not feasible to quantify, Parent shall be permitted to use historical averages to determine the amount of such costs.

5.  Office Space.  (a) The overhead costs associated with two desks in Parent's Los Angeles and Austin offices, (b) the overhead costs associated with the actual space used by employees or consultants of LZL in LZL's Chicago office and Parent's Mountain View office (and any subsequent leased office space occupied by any employees of LZL) and (c) the costs of travel of employees and consultants of the Surviving Company among offices of Parent and the Surviving Company, in each case shall be included in the calculation of Adjusted EBITDA for all purposes hereunder.

6.  Audit Expenses.  For all purposes hereunder, the expenses associated with the audit of LZL's financial statements shall be included in the calculation of Adjusted EBITDA.

7.  Impairment Charges.  For all purposes hereunder, no impairment charge shall be included in the calculation of Adjusted EBITDA for prior discarded technology.

8.  Escheated Monies.  For all purposes hereunder, any monies escheated to a Governmental Body shall not be included in the calculation of Adjusted EBITDA.

**SCHEDULE A**

Abid Ali
Shane Bader
Robert Baines
Jon Nacewicz
Alex Nowak
William Novak

# EXHIBIT 2

# AMICUS MEDIA, LLC

### EXECUTIVE EMPLOYMENT, CONFIDENTIAL INFORMATION AND ASSIGNMENT OF INVENTIONS AGREEMENT

This Executive Employment, Confidential Information and Assignment of Inventions Agreement (this "Agreement") is entered into as of August 7, 2014, by and between Richard Komaiko (the "Executive") and Amicus Media, LLC (the "Company"). Each party hereinafter may be referred to individually as a "Party" or collectively as the "Parties."

**WHEREAS**, this Agreement is being entered into concurrently with the execution of that certain Agreement and Plan of Merger, by and among LegalZoom.com, Inc., a Delaware corporation, LZ Local, LLC, an Illinois limited liability company and the Company whereby the Company was acquired by Parent pursuant to a reverse triangular merger;

**WHEREAS**, the Company desires to engage Executive as a key employee of the Company to provide services to the Company and wishes to provide the Executive with certain compensation and benefits in return for such services;

**WHEREAS**, the Company desires to draw upon the knowledge, experience and objective advice of Executive in order to manage its business for the benefit of the Company;

**WHEREAS**, the Employee wishes to be employed by the Company and provide such services to the Company in return for certain compensation and benefits; and

**WHEREAS**, the Company and Executive desire to enter into this Agreement in order to specify and memorialize the terms of Executive's employment with the Company.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, it is hereby agreed by and between the Parties hereto as follows:

1.      **TERMS OF EMPLOYMENT.**

1.1.    <u>Effective Date</u>.  The effective date of this Agreement shall be August 7, 2014.

1.2.    <u>Position</u>.  Subject to terms set forth herein, the Company agrees to employ the Executive in the position of Chief Executive Officer of the Company and the Executive hereby accepts such employment as of the Effective Date.  During Executive's employment with the Company, the Executive will devote his best efforts and substantially all of his business time and attention (except for vacation periods and reasonable periods of illness or other incapacities permitted by the Company's general employment policies) to the business of the Company.

1.3.    <u>Duties</u>.  The Executive shall perform such duties as are customarily associated with his then current title, consistent with the Operating Agreement of the Company and as required by the Company's Board of Managers.  The Executive shall perform his duties at such place or places as the Company shall reasonably designate; provided that, both Company and Executive shall each maintain its rights to terminate this employment relationship as set forth herein including, but not limited to, Section 1.5 below. Notwithstanding the foregoing, unless mutually agreed in writing, for no less than two years the Executive may spend (i) up to two (2) weeks per month at the Company's office located in Chicago, and (ii) up to two (2) weeks per month at either of the Parent's Glendale, California, Mountain View, California, or Austin, Texas offices.

1.4.   _Company Policies_.  The employment relationship between the Parties shall also be governed by the general employment policies and practices of the Company, _provided_, that if any terms of this Agreement differ from or are in conflict with any of the Company's general employment policies or practices, this Agreement shall control.

1.5.   _At-Will Employment Status_.   THE EXECUTIVE UNDERSTANDS AND ACKNOWLEDGES THAT EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES "AT-WILL" EMPLOYMENT.   THE EXECUTIVE FURTHER ACKNOWLEDGES THAT THIS EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT THE OPTION EITHER OF THE COMPANY OR THE EXECUTIVE, WITH OR WITHOUT NOTICE.

## 2.    COMPENSATION AND REIMBURSEMENTS.

2.1.   _Salary_.  The Executive shall receive for services to be rendered hereunder an annualized base salary of One Hundred Twenty Thousand Dollars ($120,000.00), payable in accordance with the Company's regular payroll schedule.  Such compensation is subject to change in accordance with the policies of the Company, as determined by its Board of Managers, in force from time to time.

2.2.   _Vacation Days_.  Executive will accrue twenty (20) vacation days per year, plus all major Jewish holidays. Executive shall be entitled to vacation with pay during subsequent years of employment in accordance with the Company's vacation policy. Vacation days may accrue up to a maximum of 1.75 times the annual rate of accrual.

2.3.   _Other Non-Monetary Benefits_.  The Executive shall be entitled to certain other non-monetary benefits, including but not limited to sick days, holidays, paid time off, medical and dental plans, in accordance with the policies of the Company, as determined by its Board of Managers, in force and which may be amended from time to time.

## 3.    CHANGE OF MANAGEMENT AND TERMINATION.

3.1.   _Termination_.  In the event of Executive's termination of employment, Executive shall be entitled to the following:

a)     Accrued Salary and Vacation.  All salary and accrued vacation earned through the date of Executive's last date of employment, less applicable federal and state withholding, paid upon termination of employment;

b)     Expenses.  Within ten (10) days of submission of proper expense reports by Executive, the Company shall reimburse Executive for all expenses incurred by Executive, consistent with past practices, in connection with the business of the Company prior to Executive's termination of employment; and

c)     Employee Benefits.  Executive shall receive the benefits, if any, under any 401(k) plan, nonqualified deferred compensation plan and other Company benefit plans to which Executive may be entitled pursuant to the terms of such plans.

3.2.   _Exclusive Remedy_.  Executive shall be entitled to no other compensation, benefits, or other payments from the Company as a result of any termination of employment with respect to which the payments and/or benefits described in this Section 3 have been provided to Executive.

## 4.    CONFIDENTIAL INFORMATION.

4.1.   _Company Information_.  The Executive agrees at all times during the term of employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit

110782321 v1

of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Managers of the Company, any Confidential Information of the Company. The Executive understands that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company the Executive called or with whom the Executive became acquainted during the term of employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment.

     4.2.   <u>Exceptions</u>. The foregoing obligations and restrictions do not apply to that part of the Confidential Information that the Executive demonstrates:

     a)   was available or became generally available to the public other than as a result of a disclosure by the Executive; or

     b)   was available, or became available, to the Executive on a non-confidential basis prior to its disclosure to the Executive by the Company or a Company Representative, but only if (i) the source of such information is not bound by a confidentiality agreement with the Company or is not otherwise prohibited from transmitting the information to the Executive or a representative of the Executive by a contractual, legal, fiduciary or other obligation and (ii) the Executive provides the Company with written notice of such prior possession either (A) prior to the execution and delivery of this Agreement or (B) if the Executive later becomes aware (through disclosure to the Executive) of any aspect of the Confidential Information as to which the Executive had prior possession, promptly upon the Executive so becoming aware; or

     c)   was requested or legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demand or similar process) or is required by a regulatory body to make any disclosure which is prohibited or otherwise constrained by this Agreement, <u>provided</u>, that the Executive shall (i) provide the Company with prompt notice of any such request(s) so that the Company may seek an appropriate protective order or other appropriate remedy, and (ii) provide reasonable assistance to the Company in obtaining any such protective order. If such protective order or other remedy is not obtained or the Company grants a waiver hereunder, then the Executive may furnish that portion (and only that portion) of the Confidential Information which, in the written opinion of counsel reasonably acceptable to the Company, the Executive is legally compelled or is otherwise required to disclose; <u>provided</u>, that the Executive shall use reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any Confidential Information so disclosed.

     4.3.   <u>Former Employment Information</u>. The Executive agrees during employment with the Company, not to improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

     4.4.   <u>Third Party Information</u>. The Executive recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. The Executive agrees to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out the Executive's work for the Company consistent with the Company's agreement with such third party.

3

5.    **INVENTIONS.**

5.1.    <u>Inventions Retained and Licensed</u>.    Attached hereto as <u>Exhibit A</u>, is a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by the Executive prior to employment with the Company (collectively referred to as "Prior Inventions"), which belong to the Executive, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, the Executive represents that there are no such Prior Inventions.  If in the course of employment with the Company, the Executive incorporates into a Company product, process or machine a Prior Invention owned by the Executive or in which the Executive has an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or machine.

5.2.    <u>Assignment of Inventions</u>.    The Executive agree to promptly make full written disclosure to the Company, to hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which the Executive may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of employment with the Company (collectively referred to as "Inventions"), except as provided in Section 5.5 below.  The Executive further acknowledges that all original works of authorship which are made by the Executive (solely or jointly with others) within the scope of and during the period of employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

5.3.    <u>Maintenance of Records</u>.    The Executive agrees to keep and maintain adequate and current written records of all Inventions made by the Executive (solely or jointly with others) during the term of employment with the Company.  The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company.  The records will be available to and remain the sole property of the Company at all times.

5.4.    <u>Patent and Copyright Registrations</u>.    The Executive agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure of the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. The Executive further agrees that any obligation to execute or cause to be executed, when it is in the Executive's power to do so, any such instrument or papers shall continue after the termination of this Agreement.  If the Company is unable because of the Executive's mental or physical incapacity or for any other reason to secure a signature to apply for or to pursue any application of any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then the Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Executive's agent and attorney in fact, to act for and in behalf of the Executive to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and

4

issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by the Executive.

5.5.    Exception to Assignments.  The Executive understands that the provision(s) of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B).  The Executive shall advise the Company promptly in writing of any inventions that, in the Executive's belief, meets the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A.

6.    **EXECUTIVE REPRESENTATIONS AND WARRANTIES.**    Executive hereby represents and warrants to the Company that:

6.1.    Conflicting Contracts.  The execution, delivery or performance of this Agreement including, but not limited to, the commencement and performance of Employee's duties hereunder, does not conflict with or result in a breach or default of any agreement binding upon the Employee.  The Employee further represents to the Company that the execution, delivery, or performance of this Agreement including, but not limited to, the commencement and performance of the Employee's duties hereunder, does not violate any provision of any law, statute, rule, regulation, order, writ judgment, injunction, or decree applicable to Employee.

6.2.    Conflicting Employment.  During the term of employment with the Company, the Employee will not engage in any other employment, occupation, consulting, or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of his or her employment.

6.3.    Eligibility.  Employee is currently eligible to work in the United States, or will be made eligible to work in the United States through this Agreement.

6.4.    Policies.  Employee will adhere to all of the policies, procedures, rules and regulations set forth by Company.  These policies, procedures, rules and regulations include, but are not limited to, those set forth within the Company Employee Handbook (including any amendments), any summary benefit plan descriptions, or any other personnel practices or policies or Company.

7.    **RETURNING COMPANY DOCUMENTS.**  The Executive agrees that, at the time of leaving the employ of the Company, the Executive will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by the Executive pursuant to such employment with the Company or otherwise belonging to the Company, its successors or assigns.  In the event of the termination of employment, The Executive agrees to sign and deliver the "Termination Certification" attached hereto as Exhibit C.

8.    **NOTIFICATION OF NEW EMPLOYER.**  In the event that the Executive leaves the employ of the Company, the Executive hereby grants consent to notification by the Company to the Executive's new employer about any rights and obligations under this Agreement.

9.    **SOLICITATION OF EMPLOYEES.**  The Executive agrees that for a period of twelve (12) months immediately following the termination of the employment relationship with the Company for any reason, whether with or without cause, the Executive shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's or Parent's employees to

leave their employment, or take away such employees , or attempt to solicit, induce, recruit, encourage or take away employees of the Company or Parent, either for the benefit of the Executive or for any other person or entity.

**10.     CONFLICT OF INTEREST GUIDELINES.**  The Executive agrees to diligently adhere to the Conflict of Interest Guidelines attached as Exhibit D hereto.

**11.     REPRESENTATIONS.**  The Executive shall execute any proper oath or verify any proper document required to carry out the terms of this Agreement.  The Executive represents that the performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by the Executive in confidence or in trust prior to employment by the Company.  The Executive has not entered into, and shall not enter into, any oral or written agreement in conflict herewith.

**12.     ARBITRATION AND EQUITABLE RELIEF.**

12.1.    Arbitration.  EXCEPT AS PROVIDED IN SECTION 12.6 BELOW, THE EXECUTIVE AGREES THAT ANY DISPUTE OR CONTROVERSY ARISING OUT OF, RELATING TO, OR CONCERNING ANY INTERPRETATION, CONSTRUCTION, PERFORMANCE OR BREACH OF THIS AGREEMENT, SHALL BE GOVERNED BY CALIFORNIA LAW AND SETTLED BY ARBITRATION TO BE HELD IN LOS ANGELES COUNTY, CALIFORNIA, IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION.  THE ARBITRATOR MAY GRANT INJUNCTIONS OR OTHER RELIEF IN SUCH DISPUTE OR CONTROVERSY.  THE DECISION OF THE ARBITRATOR SHALL BE FINAL, CONCLUSIVE AND BINDING ON THE PARTIES TO THE ARBITRATION.  JUDGMENT MAY BE ENTERED ON THE ARBITRATOR'S DECISION IN ANY COURT HAVING JURISDICTION.  THE PARTIES SHALL EACH PAY ONE-HALF OF THE COSTS AND EXPENSES OF SUCH ARBITRATION, AND EACH OF THE PARTIES SHALL SEPARATELY PAY COUNSEL FEES AND EXPENSES.

12.2.    THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF THE EXECUTIVE'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE EMPLOYER/EXECUTIVE RELATIONSHIP (EXCEPT AS PROVIDED IN SECTION 12.6 BELOW), INCLUDING, BUT NOT LIMITED TO, THE FOLLOWING CLAIMS:

12.3.    ANY AND ALL CLAIMS FOR WRONGFUL DISCHARGE OF EMPLOYMENT; BREACH OF CONTRACT, BOTH EXPRESS AND IMPLIED; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, BOTH EXPRESS AND IMPLIED; NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; NEGLIGENT OR INTENTIONAL MISREPRESENTATION; NEGLIGENT OR INTENTIONAL INTERFERENCE WITH CONTRACT OR PROSPECTIVE ECONOMIC ADVANTAGE; AND DEFAMATION;

12.4.    ANY AND ALL CLAIMS FOR VIOLATION OF ANY FEDERAL, STATE OR MUNICIPAL STATUTE, INCLUDING, BUT NOT LIMITED TO, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE CIVIL RIGHTS ACT OF 1991, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE FAIR LABOR STANDARDS ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, AND LABOR CODE SECTION 201, et seq.;

12.5.    ANY AND ALL CLAIMS ARISING OUT OF ANY OTHER LAWS AND REGULATIONS RELATING TO EMPLOYMENT OR EMPLOYMENT DISCRIMINATION.

12.6.    Equitable Remedies.    THE EXECUTIVE AGREES THAT IT WOULD BE IMPOSSIBLE OR INADEQUATE TO MEASURE AND CALCULATE THE COMPANY'S DAMAGES FROM ANY BREACH OF THE COVENANTS SET FORTH IN SECTIONS 3, 4, AND 6 HEREIN.    ACCORDINGLY, THE EXECUTIVE AGREES THAT IN THE EVENT OF A BREACH ANY SUCH SECTIONS, THE COMPANY WILL HAVE AVAILABLE, IN ADDITION TO ANY OTHER RIGHT OR REMEDY AVAILABLE, THE RIGHT TO OBTAIN AN INJUNCTION FROM A COURT OF COMPETENT JURISDICTION RESTRAINING SUCH BREACH OR THREATENED BREACH AND TO SPECIFIC PERFORMANCE OF ANY SUCH PROVISION OF THIS AGREEMENT.  THE EXECUTIVE FURTHER AGREES THAT NO BOND OR OTHER SECURITY SHALL BE REQUIRED IN OBTAINING SUCH EQUITABLE RELIEF AND THE EXECUTIVE HEREBY CONSENTS TO THE ISSUANCE OF SUCH INJUNCTION AND TO THE ORDERING OF SPECIFIC PERFORMANCE.

12.7.    Consideration.  THE EXECUTIVE UNDERSTANDS THAT EACH PARTY'S PROMISE TO RESOLVE CLAIMS BY ARBITRATION IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT, RATHER THAN THROUGH THE COURTS, IS CONSIDERATION FOR OTHER PARTY'S LIKE PROMISE.  THE EXECUTIVE FURTHER UNDERSTANDS THAT THIS OFFER OF EMPLOYMENT IS MADE IN CONSIDERATION OF SUCH PROMISE TO ARBITRATE CLAIMS.

**13.    GENERAL PROVISIONS.**

13.1.    Notices.  Any notice or other communication provided for herein or given hereunder to a Party hereto shall be in writing and shall be given by delivery, by facsimile or by mail (registered or certified mail, postage prepaid, return receipt requested) to the respective Party as follows:

> If to Executive:
> At the address set forth on the signature page hereto
>
> If to Company:
> Amicus Media, LLC
> Attn: General Counsel
> 101 N. Brand Blvd., 11th Floor
> Glendale, CA 91203
> FAX: (323) 962-8300

or to such other address with respect to a Party as such Party shall notify the other in writing.

13.2.    Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of and be enforceable by the Parties, and their respective successors, assigns, heirs, executors and administrators; provided that, neither Party may assign any duties or rights hereunder without the written consent of the other Party, which consent shall not be withheld unreasonably.  Notwithstanding the foregoing, the Company may assign this Agreement without consent to (a) any of its affiliates or (b) the surviving entity in the event of a merger, acquisition, or sale of substantially all of the assets of any of the Company.

13.3.    Waiver and Amendment.  Neither Party may waive any of the terms or conditions of this Agreement, nor may this Agreement be amended or modified, except by a duly signed writing referring to the specific provision to be waived, amended or modified.

7

110782321 v1

13.4.   Entire Agreement.  This Agreement constitutes the entire agreement with respect to the subject matter hereof, and supersedes all other prior agreements and understandings, both written and oral, among the parties hereto and their affiliates.

13.5.   Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provisions had never been contained herein.

13.6.   Captions.  The Section and Paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

13.7.   Governing Law.  This Agreement shall be governed by the laws of the State of California, without regard to its conflicts of law provisions.

13.8.   No Representations.  Neither Party has relied upon any representations or statements made by the other Party hereto which are not specifically set forth in this Agreement.

13.9.   Voluntary Execution of Agreement.  This Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of the Parties hereto, with the full intent of releasing all claims. The Parties acknowledge that:

(i)      they have read this Agreement;
(ii)     they have been represented, or, in the alternative, have had the opportunity to obtain representation, in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice;
(iii)    they understand the terms and consequences of this Agreement and of the releases it contains; and
(iv)     they are fully aware of the legal and binding effect of this Agreement.


13.10.   Counterparts/Electronic Signatures.  The parties agree that (i) this Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures were upon the same instrument (ii) signatures on this Agreement communicated by facsimile or other similar electronic transmission or a digital signature provided through DocuSign (or some other similar service) shall be considered an original signature and (iii) the use of electronic signatures and the keeping of records in electronic form be granted the same legal effect, validity or enforceability as a signature affixed by hand or the use of a paper-based record keeping system to the extent and as provided for in any applicable law including the Federal Electronic Signatures in Global and National Commerce Act, California digital signature regulations, or any other similar state laws based on the Uniform Electronic Transactions Act.


[SIGNATURE PAGE IMMEDIATELY FOLLOWS]

110782321 v1

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed personally or by their duly authorized representatives as of the date first written above.

**AMICUS MEDIA, LLC.**

By: _____

John Suh

Manager

Address:  101 N. Brand Blvd., 11th Floor
          Glendale, CA 91203
Fax:      (323) 790-1993

**EXECUTIVE**

_____

Name: Richard Komaiko

Address:

E-mail:

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed personally or by their duly authorized representatives as of the date first written above.

**AMICUS MEDIA, LLC.**

By:_____
    John Suh
    Manager

Address:  101 N. Brand Blvd., 11th Floor
           Glendale, CA 91203
Fax:     (323) 790-1993

**EXECUTIVE**

*Richard Komaiko*
Richard Komaiko (Aug 7, 2014)
_____

Name: Richard Komaiko

Address:  1307 Kirkwood

E-mail: richard@attorneyfee.com

SIGNATURE PAGE TO EXECUTIVE EMPLOYMENT, CONFIDENTIAL INFORMATION AND
ASSIGNMENT OF INVENTIONS AGREEMENT

## LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|-------|------|------------------------------------------|
|       |      |                                          |
|       |      |                                          |
|       |      |                                          |
|       |      |                                          |
|       |      |                                          |
|       |      |                                          |

I have no inventions or improvements to list.

*RK*
_____
(Initials)

I have attached  0  additional sheets to this Exhibit A.

*RK*
_____
(Initials)

Date:  Aug 5, 2014
_____

*Richard Komaiko*
Richard Komaiko (Aug 5, 2014)
_____

Name:  Richard Komaiko

**CALIFORNIA LABOR CODE SECTION 2870
EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS**

"(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2)     Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

**EXHIBIT C**

**AMICUS MEDIA, LLC**

**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to LegalZoom.com, its subsidiaries, affiliates, successors or assigns, including Amicus Media, LLC (together, the "Company").

I further certify that I have complied with the terms of Amicus Media, LLC's Executive Employment Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Executive Employment, Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its Executives, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I will not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees to leave their employment.

Date: _____

_____
Employee Signature
(upon termination of employment)

EXHIBIT C

## AMICUS MEDIA, LLC

## CONFLICT OF INTEREST GUIDELINES

It is the policy of Amicus Media to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interest of the Company. The following are potentially compromising situations that must be avoided. Any exceptions must be reported to the CEO and written approval for continuation must be obtained.

1.  Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended (The Executive Employment, Confidential Information and Assignment of Invention Agreement elaborates on this principle and is a binding agreement.)

2.  Accepting or offering substantial gifts, excessive entertainment, favors or payments which may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.  Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.  Initiating or approving personal actions affecting reward or punishment of Executives or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.  Initiating or approving any form of personal or social harassment of employees.

6.  Investing or holding outside directorships in any competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.  Borrowing from or lending to employees, customers, or suppliers.

8.  Acquiring real estate of interest to the Company.

9.  Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10. Unlawfully discussing prices, costs, customers, sales or markets with competing companies or their employees.

11. Making any unlawful agreement with distributors with respect to prices.

12. Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

Each officer, employee and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.

# EXHIBIT 3





# EXHIBIT 4

10/7/2015                                              Follow Up



Richard Komaiko <komaiko@gmail.com>

---

# Follow Up
10 messages

---

**Richard Komaiko** <komaiko@gmail.com>                                   Thu, Sep 3, 2015 at 11:57 PM
To: jsuh@legalzoom.com

Hi John,

Thank you for flying up to see me yesterday. I want to issue a correction - Beibei and Eddie told me that my salary would be cut off at the end of May, but upon closer inspection it turns out they did not actually follow through on that.

In any event, yesterday was a valuable opportunity to get aligned on what actually happened. As you seek direction on how to resolve this situation, please consider what it means for Eddie to have asked you to fully fund my earn out. It's not just a request - it's also an acknowledgement.

Let's touch base in a few days when we've both had an opportunity to paw at it a little more.

Love and blessings,
Richard

---

**John Suh** <jsuh@legalzoom.com>                                        Fri, Sep 4, 2015 at 12:34 AM
To: Richard Komaiko <komaiko@gmail.com>

Yes, it frankly shocked me that Eddie would cut salary without informing me and I asked Eddie this afternoon how he could possibly think of cutting salary before resolution or approval from myself. He was adamant that absolutely did not happen, nor would he have contemplated any such violation of our controls and processes. He did not understand the accusation.

I further had finance pull up the records and confirmed direct deposit every two weeks without stoppage.

I don't understand how there could be a miscommunication of this magnitude. It is also difficult to understand how you were not aware that you have been receiving a full paycheck for 3 months.

Either way, it feels there has been lots of miscommunication and misunderstanding.

As discussed, I'm positive Eddie did not take hundreds of thousands of lines of code for monetization of some B2B play that was hidden from me. And we both agree there has never been a stoppage of salary for 3 months.

Eddie's request in May was because he believed the business to be ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬ That was and is still not the case.

If the business was ▬▬▬▬ we would have flexibility to do many things. The facts are it is ▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ There is realistically no such flexibility.

John

---

Sent from my PDA
[Quoted text hidden]
This email and any attachments to it may be confidential. If this email was sent to you in error, please notify me immediately by replying to this email, and please do not use, distribute, retain, print, or copy the email or any of its attachments. LegalZoom is not a law firm and provides self-help services at your specific direction. LegalZoom is

# EXHIBIT 5



| | | |
|---|---|---|
| SIDLEY AUSTIN LLP | BEIJING | HONG KONG | SAN FRANCISCO |
| 555 WEST FIFTH STREET | BOSTON | HOUSTON | SHANGHAI |
| LOS ANGELES, CA 90013 | BRUSSELS | LONDON | SINGAPORE |
| (213) 896 6000 | CHICAGO | LOS ANGELES | SYDNEY |
| (213) 896 6600 FAX | DALLAS | NEW YORK | TOKYO |
| | GENEVA | PALO ALTO | WASHINGTON, D.C. |

bjohnsen@sidley.com
(213) 896 6678                     FOUNDED 1866

October 2, 2015

Seth Yohalem
Waskowski Johnson Yohalem LLP
954 West Washington Boulevard, Suite 720
Chicago, Illinois 60607

**Via Email and FedEx**

Re:    Notice of Potential Termination for Cause and Claims Against Richard Komaiko

Dear Seth:

Sidley Austin LLP represents LegalZoom.com, Inc. ("LegalZoom") and Amicus Media, LLC ("Amicus"). The purpose of this letter is to notify Richard Komaiko ("Komaiko") that LegalZoom and Amicus have determined that it has become necessary to terminate Komaiko's employment with Amicus, including as Chief Executive Officer ("CEO"). LegalZoom further notifies Komaiko that "Cause" for Komaiko's termination exists pursuant to the Agreement and Plan of Merger ("Merger Agreement"), entered into as of August 7, 2014, which will result in a 50% reduction of the Reserve Payment[1] to be paid to the Unitholders. Finally, and as described more fully below, Amicus and LegalZoom are deeply concerned that Komaiko engaged in fraudulent and tortious conduct, both in connection with the negotiation and entry into the Merger Agreement and after the August 7, 2014 merger, and that Komaiko is in breach of numerous of Komaiko's obligations under the Merger Agreement and the Executive Employment, Confidential Information and Assignment of Inventions Agreement ("Employment Agreement"), entered into as of August 7, 2014, between Komaiko and Amicus. LegalZoom and Amicus have suffered at least $4.6 million in damages as a result of what they believe to be Komaiko's tortious conduct and breaches of contractual obligations and intend to prosecute those claims against Komaiko to recover such losses plus punitive damages.

**Intent to Terminate Komaiko's Employment for Cause Under the Terms of the Merger Agreement**

LegalZoom and Amicus have decided it is necessary to terminate Komaiko's employment with Amicus and remove him as CEO. Komaiko is an "at-will" employee pursuant to the terms of the Employment Agreement, which allows Amicus to terminate Komaiko with or without cause and with no notice or opportunity to cure. As described below, the termination of

---

[1] Capitalized terms not defined herein have the same meaning as in the Merger Agreement.



Seth Yohalem
October 2, 2015
Page 2

Komaiko's employment is absolutely necessary because of, among other things, Komaiko's
fraudulent and tortious conduct and utter failure to perform the duties required by Komaiko's
Employment Agreement.

        In addition, there is "Cause" for the termination of Komaiko's employment under
Section 1.5(a)(ii) of the Merger Agreement.  Specifically, Komaiko has engaged in gross
misconduct which has been materially detrimental to LegalZoom and Amicus; Komaiko has
materially violated and refused to comply with the Merger Agreement, Employment Agreement,
and Amicus' and LegalZoom's policies; and Komaiko has committed fraud, acted dishonestly,
and with moral turpitude, including because Komaiko is believed to be operating an illegal
marijuana-related business instead of devoting Komaiko's efforts to Amicus.[2]  The specific
factual circumstances constituting "Cause" for the termination of Komaiko's employment are
described in detail below, and pursuant to the express terms of the Merger Agreement, there is no
opportunity to cure this conduct (which has been so damaging it could not be cured in any
event).

### Komaiko's Fraudulent Misrepresentations and Concealments and Breach of the Representations and Warranties in the Merger Agreement

        Komaiko made misrepresentations to and concealed facts from LegalZoom to
induce it to enter into the merger with Amicus under circumstances that Komaiko knew would
have made LegalZoom abandon the merger or any similar transaction.  Making matters worse,
Komaiko's tortious conduct continued after the merger, making it impossible for LegalZoom to
make Amicus a success.

        Specifically, prior to the merger, Komaiko was aware that in assessing a potential
transaction with Amicus, LegalZoom was focused on the potential for profitability offered, and
the viability of the business model that had been developed, by Amicus.  Komaiko made
representations to LegalZoom respecting the future profitability and projected growth of Amicus,
even though Komaiko knew (or should have known) that the growth projected was not
sustainable because the business model was not viable and that Amicus could not achieve the
financial results Komaiko projected.

        LegalZoom also believed that the past success and expected continued success of
Amicus following a merger with a LegalZoom subsidiary was dependant on Amicus' primary
human capital – Komaiko and  Beibei Que ("Que").  Accordingly, it was only with the assurance

---

[2] A drafting error resulted in the mistaken inclusion of two definitions of "Cause" in the Merger Agreement.
Although not applicable, Komaiko's conduct constitutes "Cause" under both versions of the definition.



Seth Yohalem
October 2, 2015
Page 3

that Komaiko and Que would continue to collaborate and jointly run Amicus post-merger that LegalZoom decided to consummate the transaction.[3]

LegalZoom relied on Komaiko's representations when it agreed to the merger as of August 7, 2014. When the merger closed, LegalZoom paid the $3 million initial payment to the Amicus Unitholders, which included over $700,000 paid to Komaiko.

After the merger closed, however, LegalZoom learned that several of Komaiko's representations on which it had relied were false. First, after receiving financials for July 2014 and thereafter, LegalZoom learned that Komaiko had misrepresented the imminent profitability of Amicus, which, as later discovered, was far from being profitable.

Second, Komaiko also made misrepresentations concerning the viability of the Amicus business model. Indeed, after the merger, Komaiko admitted to Eddie Hartman ("Hartman") and others that he had always known that the Amicus business model was unworkable. LegalZoom now believes Komaiko reached this conclusion prior to the merger when it became obvious that the trajectory for profitability could not be sustained. Following the merger, Amicus suffered tremendous financial losses, which have continued today and have resulted in substantial losses to Amicus.

Third, Komaiko concealed his plan to end his romantic relationship with Que, notwithstanding Komaiko's representations that he and Que would continue to work cooperatively to manage Amicus after the merger. In Komaiko's meeting with John Suh ("Suh") on September 22, 2015, Komaiko admitted that Komaiko and Que had started having issues in their relationship prior to closing the merger.[4] Komaiko fully understood that Komaiko's and Que's continued working partnership was a critical component of the merger and was an asset of Amicus in which LegalZoom placed substantial value. Komaiko nonetheless failed to disclose and concealed from LegalZoom the imminent end to Komaiko's relationship upon the completion of the merger knowing that such post-merger action would severely and adversely affect the ability of Komaiko and Que to work together. The toxic and unproductive working environment resulting from Komaiko's actions has only worsened over the 14 months since the closing of the merger.

---

[3] The importance to LegalZoom of Komaiko's and Que's continued management of Amicus is confirmed by numerous aspects of the merger structure, including the delayed payment of the $2 million Reserve Payment, which could be reduced by 50% if Komaiko or Que resigned without good reason or were terminated for Cause, and would be eliminated all together if Komaiko and Que both resigned without good reason or were terminated for Cause. Further, the potential for $10 million of Earnout Payments was designed to incentivize Komaiko and Que to stay and make Amicus a success. Also, the Employment Agreement required Komaiko to use his "best efforts" and all of [Komaiko's] business time and attention" to manage and grow the Amicus business.
[4] Although Komaiko and Que disagree respecting who ended the relationship, the effect was the same and does not change the fact that Komaiko knew there were issues prior to the closing of the merger that would affect their working relationship post-merger but failed to disclose the fact of these issues.



Seth Yohalem
October 2, 2015
Page 4

Komaiko's intent to hide or misrepresent these material facts is demonstrated by Komaiko's pushing without justification to close the merger as soon as possible before the end of July 2014 when subsequent financials would be available. Komaiko knew that LegalZoom would not have consummated the merger had it known the true circumstances of Amicus, and, therefore, Komaiko hid these facts.

Komaiko's fraudulent conduct has resulted in excess of $4.6 million in damages to LegalZoom, which consists of the amounts LegalZoom was tricked into paying for Amicus, as well as Amicus' losses since the merger. This unquestionably is fraud, and LegalZoom intends to file claims against Komaiko to hold him responsible for this conduct, to seek the return of what Komaiko took from LegalZoom, and to obtain punitive damages.

Komaiko also has breached the Representations and Warranties in the Merger Agreement. Specifically, Komaiko (and others) represented and warranted that the Merger Agreement does not "omit to state any material fact necessary in order to make the representations, warranties and information contained and to be contained herein and therein (in the light of the circumstances under which such representations, warranties and information were or will be made or provided) not false or misleading." Merger Agreement, § 2.22. Further, the Merger Agreement provides that "[t]here is no information or other fact that is or may become materially adverse to the business, condition, assets, capitalizations, . . . liabilities, operations, results of operations, financial performance or prospects of [Amicus]." *Id*. By failing to disclose facts concerning the viability of the business, the inability of Amicus to sustain the profitability Komaiko projected, hiding the imminent end to Komaiko's romantic relationship with Que knowing it would destroy the productive working relationship between Komaiko and Que, and other conduct described herein, Komaiko breached Section 2.22 of the Merger Agreement. As a result of the breach of Section 2.22, Komaiko and the other Earn-Out Participants must indemnify LegalZoom and its affiliates for all damages resulting from the breaches of the Representations and Warranties in the Merger Agreement. *Id*., § 6.

**Komaiko's Complete and Utter Failure to Perform His Duties as CEO in Breach of His Employment Agreement and Other Duties Owed to Amicus**

Within less than a month of the merger closing, Amicus was already financially failing and was facing increasing pressure from the Board of Directors of LegalZoom to turn around the abysmal financial results. As CEO, Komaiko was responsible for the performance of Amicus, but Komaiko failed to perform his duties in numerous respects.

First, Komaiko has had repeated extended absences from Amicus during the over sixteen months since the merger closed. These absences have adversely affected Komaiko's performance of his duties as CEO and have injured Amicus and LegalZoom. Immediately after the merger, for example, Komaiko did not appear in the office as required



Seth Yohalem
October 2, 2015
Page 5

under his Employment Agreement, but instead took an extended vacation and essentially was
unavailable for almost all of August and September, 2014.  Similarly, in the spring of 2015, it
was expected that Komaiko would contribute substantial time and effort to develop a plan for
Amicus, in advance of a LegalZoom Board meeting in May 2015.  Not only did Komaiko fail to
contribute to the effort in any meaningful way, he took an extended, international vacation
immediately prior to the Board Meeting, after being asked explicitly by Hartman not to do so.
Komaiko contends that he was gone for only one week[5] and that nothing was asked of him as
CEO of Amicus, but this is belied by Hartman's repeated requests for Komaiko to perform his
job.  Komaiko has stated that he felt Hartman had no actual work for Komaiko, but Komaiko
admitted that he knew that it was crunch time with the upcoming Board presentation in May
2015.  Indeed, Komaiko was the CEO of Amicus.  Komaiko's job was not to wait for an
assignment or task list, but to lead the company and determine how to best fix the business – to
proactively identify and solve problems.  Instead, Komaiko consistently misrepresented his
whereabouts and effectively abandoned the company.  As a result, others at LegalZoom were
forced to perform Komaiko's job duties and prepare for and make the presentation to
LegalZoom's Board concerning Amicus.  They shouldered *Komaiko's* responsibilities, in
addition to their own responsibilities at LegalZoom, when Komaiko, the CEO of Amicus, was
again absent in dereliction of his duties as CEO of Amicus.  These are just a couple of examples
of the numerous unjustified, extended absences over the last 14 months.  Due to Komaiko's
absences and for other reasons, Komaiko has completely failed to address the poor performance
of Amicus.

Third, Komaiko's erratic and unprofessional behavior has created a toxic and
unproductive working environment at Amicus, materially impeding any potential for success or
turnaround of the company.  Komaiko regularly alienated the employees and remaining
leadership of Amicus, including Bryan Harris ("Harris") and Jon Nacewicz ("Nacewicz"), the
Amicus sales team, and others.  Komaiko alienated Que to the extent that they are no longer able
work together, thus denying LegalZoom the benefits of the collaboration and partnership for
which it had contracted.  Komaiko also alienated executives at LegalZoom by making baseless
accusations, including by accusing Mr. Hartman of stealing code owned by LegalZoom.  While
Komaiko claims he only accused Hartman of stealing "Codebase," LegalZoom sees no material
difference in the negative effect of the false allegation.

Fourth, it is believed that Komaiko is involved in a marijuana-related business,
which at worst, is illegal, and at best, does not reflect positively on the business of Amicus and
takes away from the time Komaiko is supposed to dedicate to Amicus.

---

[5] Whether an extended vacation or merely a week, LegalZoom notes that Komaiko failed to enter any vacation time
into the Company payroll system to properly adjust his accrued vacation.



Seth Yohalem
October 2, 2015
Page 6

This conduct, individually and taken together: (i) violates Komaiko's
Employment Agreement, which requires him to "devote [his] best efforts and substantially all of
[his] business time and attention . . . to the business of the Company", Employment Agreement,
§ 1.2; to "perform such duties as are customarily associated with" the position of CEO and "as
required by the Company's Board of Managers, *id.*, § 1.3; and to be present in the LegalZoom
offices in either Glendale, California, Mountain View, California, or Austin, Texas for two
weeks every month, *id.*; (ii) is a breach of the implied covenant of good faith and fair dealing,
which is implied in every contract and requires the parties to a contract to deal with each other in
good faith and not act in a manner designed to deprive a party of known or expected benefits of a
contract or agreement; (iii) is a breach of Komaiko's duty of loyalty, which he owed as an officer
of Amicus and required him to, among other things, devote all of his time and attention during
business hours to the business of Amicus and to pursue the company's best interests at all times;
and (iv) violated California Labor Code § 2854, pursuant to which Komaiko had a duty to
perform his job duties using ordinary care and diligence.

Moreover, the factual circumstances make it very clear that Komaiko never had
any intention of performing his obligations under the Employment Agreement or providing
undivided loyalty to Amicus and LegalZoom, which also is actionable fraud.

**Komaiko's Scheme to Sabotage Amicus for His Own Financial Gain**

Komaiko not only has failed to provide the agreed upon services for the benefit of
Amicus, as described above, Komaiko also has taken affirmative steps to ensure its demise.

In as early as November 2014, Komaiko admitted to Hartman that the success of
Amicus was not Komaiko's primary interest. As Komaiko explained to Hartman, Komaiko was
going to receive a significant payout in any event – either in the form of the Earnout Payments if
Amicus were a success or from the accelerated Reserve Payment if it failed. As such, Komaiko
did not share Hartman's interest in working to ensure that the business achieved the profit and
loss goals or otherwise was successful for the benefit of LegalZoom's shareholders. Moreover,
Komaiko already was focused on his next venture, further making Amicus a secondary concern
for Komaiko.

In or around January 2015 and again later this year, Komaiko took this apathetic
view a step further and affirmatively planned to damage Amicus. Specifically, Komaiko
approached Que and proposed that she help Komaiko "tank" Amicus in the hopes of
discontinuing the business to accelerate payment of the Reserve Payment.

Although, Komaiko has denied making this suggestion to Que, the collective
recollections of each of Amicus' founders and many of Komaiko's former colleagues, including
LegalZoom founder Hartman, Que, Steven Kloder, Harris, Nacewicz, and others, each of whom



Seth Yohalem
October 2, 2015
Page 7

point to ethical lapses and questions they have about Komaiko's truthfulness, corroborate Que's recollection.

Such conduct by a CEO is antithetical to the trust and confidence LegalZoom placed in Komaiko, and is a breach of Komaiko's fiduciary duties and duties of loyalty and care. As a result of his position with Amicus, LegalZoom and Amicus reposed substantial trust and confidence in Komaiko, which Komaiko voluntarily accepted and was compensated handsomely for, to act in the best interests of Amicus and to abide by his fiduciary duties to Amicus. Indeed, as CEO of the company and pursuant to the Employment Agreement, Komaiko owed a fiduciary duty to act toward Amicus fairly, honestly, in good faith, with undivided loyalty, to avoid conflicts of interest, to act in the best interests of the company, and to refrain from any act, or omission to act, calculated or likely to injure Amicus. By Komaiko's conduct, detailed in this section and above, he intentionally, knowingly, repeatedly, and in bad faith breached his fiduciary duties, including his duty of loyalty, to promote his own personal, pecuniary interests in willful disregard of the company's best interests. Such conduct subjects Komaiko not only to liability for damages but also for punitive damages.

Komaiko's attempts to sabotage Amicus also is a breach of his Employment Agreement.

Finally, Komaiko also attempted to conspire with Que to induce her to breach her fiduciary duties to Amicus when Komaiko asked her to help Komaiko sabotage Amicus.

### Komaiko's Conduct Is Cause for Termination Under The Merger Agreement, and LegalZoom and Amicus Have Suffered Substantial Damages As A Result of Komaiko's Conduct

The conduct described above individually constitutes Cause and taken together is without question Cause for the termination of Komaiko's employment under the Merger Agreement. Moreover, and as explained above, LegalZoom and/or Amicus have numerous claims against Komaiko, including fraud, promissory fraud, negligent misrepresentation, breach of fiduciary duty, breach of the duty of loyalty, conspiracy to breach a fiduciary duty, breach of the employment agreement, breach of the Merger Agreement and for indemnity, and breach of California Labor Code § 2854.

Given the numerous claims LegalZoom and Amicus have against Komaiko, they will seek the full panoply of available damages. In addition to the over $4.6 million in compensatory damages – consisting of the Upfront Payment and the losses of Amicus thus far – which have been caused by Komaiko's fraudulent and tortious conduct, LegalZoom and Amicus may seek consequential damages, rescission and reformation of the Merger Agreement, return of all amounts paid to Komaiko in connection with the Merger Agreement, interest and costs. The



Seth Yohalem
October 2, 2015
Page 8

Merger Agreement also permits the prevailing party to recover attorneys' fees so, in addition to the amount Komaiko may spend defending these claims, Komaiko will be required to pay the fees and costs of LegalZoom's and Amicus' attorneys. Additionally, as noted above, several of the claims provide the right to recover punitive damages, which often range in the high six- to seven-figures.

\*    \*    \*    \*    \*

        With this letter, Komaiko is hereby on notice of the disputes and possible litigation against him. As a result, Komaiko has a duty to preserve documents and evidence relating in any way to LegalZoom's and Amicus' claims. Specifically, he must preserve all documents or evidence (whether in paper or electronic form), and regardless of whether they are stored on his personal computers or devices, regarding the Merger Agreement, Employment Agreement, other agreements and documents related to the merger in August 2014, and the claims against Komaiko described herein. LegalZoom and Amicus hereby demand that Komaiko not destroy, erase, delete, modify, or otherwise alter any such evidence in Komaiko's possession or control that in any way relates to Komaiko's employment with Amicus or the Merger Agreement between the parties. Komaiko's obligations in this regard are described more fully in a separate letter submitted concurrently. Given the details in this letter and in response to your October 1, 2015 letter, there should be no question respecting the appropriate scope of documents that the parties to this dispute must retain.

        Nothing contained herein is intended to be, nor is, the admission of any fact, nor the waiver of any right, remedy, claim, or defense which LegalZoom and Amicus may have concerning the foregoing, all of which are expressly reserved.

                    Very truly yours,

                    Bridget S. Johnsen

cc:    Ryan Lapine
       Adam Waskowski
       Daniel Johnson
       Max C. Fischer